VAN WINKLE & LIGGETT, PLAINTIFF-RESPONDENT, AND LATORRACA REALTY CORP., PLAINTIFF, v. G.B.R. FABRICS, INC., DEFENDANT-APPELLANT.

Argued April 28, 1986—Decided July 14, 1986.

*Joseph B. Fiorenzo* argued the cause for appellant (*Greenstone & Sokol,* attorneys).

*Gene N. Schiffman* argued the cause for respondent (*Schiffman & Berger,* attorneys; *Richard G. Berger,* on the brief).

The opinion of the Court was delivered by

STEIN, J.

In this case the trial court awarded a judgment for a brokerage commission in a real estate transaction that was never consummated. The Appellate Division affirmed in an unreported opinion. We granted certification, 102 *N.J.* 333 (1985), to consider the result in the context of our holding in *Ellsworth Dobbs, Inc. v. Johnson,* 50 *N.J.* 528 (1967), that "absent default

by the owner, the contract of sale must be performed by the buyer before liability for commission is imposed upon the owner." *Id.* at 551. We now reverse because the parties' inability to complete the sales transaction was not caused by the seller's default or wrongful conduct.

## I

Appellant, G.B.R. Fabrics, Inc. (GBR), a textile manufacturer, was the owner of a parcel of real estate located in Rutherford, New Jersey. Because the lot was part of a collateral package provided by GBR as security for a $946,000 flood-disaster loan issued by the Small Business Administration (SBA) in 1979, the property was encumbered by a mortgage held by the SBA.

In February 1979, John Scott, a broker employed by respondent Van Winkle & Liggett (Van Winkle), contacted George Rubin, the principal shareholder of GBR, concerning the listing of GBR's property for sale through Van Winkle. Scott and the president of Van Winkle met with Rubin and his accountant to consider a proposed exclusive-listing agreement. The parties discussed a sales price of $300,000 to $350,000, as well as GBR's willingness to take back a purchase money mortgage. Because GBR had previously entered into an option agreement for the sale of the land that would not expire until June 1979, Van Winkle took no steps to market the property at that time.

In September 1979, at the request of Joseph Baker, another Van Winkle employee, Rubin agreed to sign a non-exclusive listing agreement with Van Winkle. The agreement was a pre-printed form used by Van Winkle and provided that Van Winkle would receive a commission of 6% of the gross sales price, payable when title passed, if Van Winkle was "instrumental in effecting a sale or lease" of the property. Van Winkle posted a sign on the GBR lot indicating that it was for sale. During the next ten months, it exerted what one respondent's witness characterized as its "usual efforts" to attempt to sell the property.

In May 1980, Scott was informed by Latorraca Realty Corp. (LRC) that a partnership known as Columns Enterprises (Columns) was interested in purchasing the property. After brief negotiations, the parties agreed on a purchase price of $325,-000, with GBR taking back a short-term mortgage for approximately 90% of the purchase price. On June 3, 1980, Scott and the president of Van Winkle hand-delivered Columns' proposed form of contract to GBR. Although the issue was vigorously contested at trial, the trial court found, and the Appellate Division agreed, that it was on this date that Van Winkle first learned from Rubin of the existence of the SBA mortgage. Following the meeting, Scott immediately sent Rubin a letter confirming the discussion and indicating that both he and Daniel Van Winkle were "very surprised" to learn of the existence of the SBA lien. Nevertheless, Van Winkle continued to use its best efforts to consummate the sale of the lot.

On June 9, 1980, GBR informed Van Winkle that it preferred an all-cash transaction at a price of $315,000. Through Van Winkle, Columns orally accepted the new proposal that same day. Scott confirmed the offer and acceptance in a letter to GBR that stated that the "offer and acceptance is subject to contracts being prepared and approved by both buyer and seller's attorney[s]." The letter also indicated, like the listing agreement, that "[a] commission of 6% will be paid * * * upon closing of title."

Thereafter, the contract negotiations were handled by GBR's attorney, Samuel Bornstein, and Columns' attorney, James Harrison. Harrison prepared a revised contract, which Scott, Rubin, and Bornstein reviewed on June 13, 1980. In addition to other proposed changes, Bornstein inserted the following paragraph with respect to release of the SBA mortgage:

This Contract is expressly conditioned upon the Small Business Administration releasing a mortgage interest which it holds in the premises to secure an indebtedness incurred by the Seller. The parties hereto understand that it is not within the power of the Seller to require that the said interest be released; however, the Seller will use its best efforts to secure such release. In the event that the said release cannot be obtained upon terms which are satisfactory to

the Seller, in its sole discretion, by July 7, 1980, the Seller may void this Agreement and thereafter shall have no further obligation to the Purchaser other than the return of the deposit moneys in the sum of $31,500.00, forthwith.

Scott delivered to Harrison the revised contract signed by GBR.

At trial, Scott insisted that Bornstein did not explain any of the other "legal" aspects of the proposed contract changes to him. Bornstein, on the other hand, testified that each change was explained to Scott.[1] The trial court found that neither Scott nor anyone connected with Van Winkle played a role in either negotiating or determining the final provisions of the sales contract.

Before it received a signed copy of the revised contract from Columns,[2] GBR tried to obtain the release of the SBA mortgage. On June 13, 1980, Bornstein telephoned William Smyth, an SBA loan officer, to explain the sales contract and the proposed collateral substitution. According to Bornstein's testimony, Smyth "thought it was a good idea" and told him to contact Howard Epstein of the SBA who could advise him how the substitution could be effectuated. In a letter dated June 20, 1980, Bornstein apprised the SBA of the GBR–Columns contract and proposed the following collateral substitution:

We [GBR] propose to sell the property for the stated consideration and to place the proceeds in a tax-free investment portfolio. *The only investment purchases made for that portfolio would be in such tax-free instruments as would meet with the approval of the S.B.A.* This portfolio would be subject to the same lien as was the real property. Since the instruments would likely include bearer certificates, we would propose that this law office act as escrow agent of the physical certificates. *No liquidation of an instrument in the portfolio nor any trade could be accomplished without the proper prior approval of the S.B.A.* Any additional documentation necessary to confirm this arrange-

---

[1] Bornstein also appended a rider that indicated that LRC was the sole broker to receive a commission from the sale. According to Scott's testimony, after Rubin pointed out the discrepancy in the commission arrangement, Bornstein inserted a clause indicating that Van Winkle and LRC would share equally in the commission.

[2] The contract was not executed by Columns until July 22, 1980.

ment would be executed by the borrowers, the S.B.A. and the escrow agent before the contract to sell the property was signed.

\* \* \* \* \* \* \* \*

We believe that the sale of the real property would benefit both the S.B.A. and the borrowers. The borrowers would be free of some of the ownership costs and the S.B.A. would have a more liquid security. [Emphasis added.]

The SBA rejected the proposed collateral substitution in a letter written by Smyth, determining that

[t]he purpose of this reduced rate loan was to fulfill a need resulting from a natural disaster and the real estate collateral was required as the business collateral was inadequate to secure the loan. Therefore, if this property is sold, we would release our lien for the net proceeds applied to the loan unless there is a compelling business reason. As proposed, it would appear that this Agency's low interest disaster funds may [not] be used for investment.

According to Bornstein's testimony, he responded to the SBA rejection with several telephone calls to Epstein. On July 16, 1980, he also sent a letter to Ronald Langell, the acting chief portfolio manager of the SBA, which read in part as follows:

[Mr. Smyth's] letter indicated that the S.B.A. would not approve [the collateral substitution] because the purchase of such securities should not be encouraged with low interest disaster loans. We respectfully submit that our request has been misconstrued. The borrowers do not request that you release your lien so that we may make investments with loan proceeds. G.B.R. Fabrics, Inc., owned the property long before the loss. The premises were purchased long ago for investment and are not in any way connected with the business operations which were rehabilitated with the proceeds of the disaster loan money.

The proposal is simply to effect a substitution of collateral—nothing more. Now you have a $946,000 mortgage on certain real property; after the transaction you would have a $946,000 mortgage on the securities substituted for the real property. *No securities would be purchased without your approval as to their rating. You would also have the right to approve the escrow designee.*

The borrowers would be benefited from the substitution since they believe the purchase price to be somewhat in excess of the worth of the real property. The S.B.A. would be benefited because the substituted collateral is undoubtedly more marketable than the real property. [Emphasis added.]

Despite Bornstein's efforts, the SBA, by letter dated July 22, again rejected GBR's request. Bornstein promptly informed Harrison of the SBA denial and indicated that the proposed sale could not be consummated. Bornstein and Harrison agreed that Harrison could try to obtain SBA approval. Harrison's efforts also proved futile. Accordingly, GBR terminated the

agreement pursuant to the contingency in the contract. Harrison returned the escrow funds to his client.

Without further communication among the parties, Van Winkle and LRC instituted suit against GBR demanding payment of the 6% commission, which amounted to $18,900.[3]  GBR filed an answer and a counterclaim, alleging malicious prosecution, breach of fiduciary duty, and fraud.

The trial court, sitting without a jury, found that GBR had a duty to disclose the existence of the SBA mortgage when it initially agreed to list the property, but concluded that Van Winkle had waived any rights resulting from the nondisclosure. In its oral opinion, the court held, however, that GBR's request to the SBA to substitute collateral was unreasonable:

> The tax free return to defendant GBR, would greatly exceed the tax deductible interest it paid to the SBA.  The SBA loans are not designed or intended to be investment vehicles for a borrower.  They're designed to alleviate disasters that occur.
>
> \*        \*        \*        \*        \*        \*        \*        \*
>
> For the SBA to have approved a release on the terms requested would have been an abuse of the disaster loan policy of the federal government and this court finds that the SBA did the proper thing in refusing that request.

The court observed that although the seller had the right to insert such a contingency in the contract of sale as it related to the prospective purchaser, the seller owed the broker a duty not to unreasonably prevent the sale from closing.  Relying on *Ellsworth Dobbs, Inc. v. Johnson, supra,* 50 *N.J.* 528, the court determined that Van Winkle had produced a ready, willing, and able purchaser and that the only reason the transaction was not consummated was that GBR had insisted on unreasonable conditions for the release of the SBA mortgage.

The trial court rejected GBR's argument that Van Winkle, by consenting to the SBA contingency clause in the contract, made its listing agreement subject to fulfillment of the contingency

---

[3]The complaint of LRC was dismissed by the trial court.  That dismissal is not involved in this appeal.

clause. The court observed that Van Winkle was not a party to the contract of sale, and that GBR had never requested Van Winkle to amend the listing agreement to incorporate the SBA-mortgage-release contingency. Judgment was entered in the amount of the $18,900 commission, plus interest of approximately $4,700.

The Appellate Division affirmed the judgment, observing that the trial court's decision "that [appellant] unreasonably exercised the 'sole discretion' vested in it under the contract of sale and that it fell short of its 'best efforts' to secure the release of [the] * * * mortgage" was supported by sufficient credible evidence in the record, citing *Rova Farms Resort Inc. v. Investors Ins. Co.*, 65 *N.J.* 474, 484 (1974). The Appellate Division also agreed with the trial court's conclusion that Van Winkle had waived its rights flowing from GBR's failure to disclose the SBA mortgage.

## II

Prior to *Ellsworth Dobbs, supra,* 50 *N.J.* 528, the common-law rule was that in the absence of an express agreement to the contrary, a real estate broker earned its commission by producing a willing and able purchaser who entered into a contract of sale. *Id.* at 543; *see, e.g., Blau v. Friedman*, 26 *N.J.* 397, 401 (1958); *Hedden v. Folio*, 62 *N.J.Super.* 470, 474 (App.Div.1960); *Beckmann, Inc. v. (Zinke's) Rainbow's End, Inc.*, 40 *N.J.Super.* 193, 196 (App.Div.), certif. denied, 22 *N.J.* 219 (1956); *Alexander Summer Co. v. Weil*, 16 *N.J.Super.* 94, 98 (App.Div. 1957); *Hinds v. Henry*, 36 *N.J.L.* 328, 332 (Sup.Ct.1873). Any perceived ambiguity in the language of a listing agreement, such as a provision that the commission would be "paid on closing" or "payable when title passes," was often construed as controlling the time of the payment of the commission and not as a condition precedent to the broker's right to receive the commission. *See, e.g., Steinberg v. Mindlin*, 96 *N.J.L.* 206, 208–09 (E. & A.1921); *Hedden v. Folio, supra,* 62 *N.J.Super.* at

474 (citing *J.R. Tucker, Inc. v. Mahaffey*, 6 *N.J.Misc.* 17 (Sup. Ct.1928), and *Winter v. Toldt*, 32 *N.J.Super.* 443 (App.Div. 1954)); *Klipper v. Schlossberg*, 96 *N.J.L.* 397, 401 (Sup.Ct.1921). *But see, e.g., Lippincott v. Content*, 123 *N.J.L.* 277, 279 (E. & A.1939); *Leschziner v. Bauman*, 83 *N.J.L.* 743, 744–46 (E. & A.1912); *Hatch v. Dayton*, 130 *N.J.L.* 425, 427 (Sup.Ct.1943); *Morse v. Conley*, 83 *N.J.L.* 416, 418 (Sup.Ct.1912).[4] Even if title did not close because the buyer was financially unable to perform, the broker would still be entitled to a commission. *Hedden v. Folio, supra,* 62 *N.J.Super.* at 474; *Winter v. Toldt, supra,* 32 *N.J.Super.* at 447; *Richard v. Falleti,* 13 *N.J.Super.* 534, 536 (App.Div.1951).

In rejecting this rule, we were mindful of the fact that when an owner lists his property with a broker, the owner invariably expects that the money for a brokerage commission will be paid out of the proceeds of sale. *Ellsworth Dobbs, Inc. v. Johnson, supra,* 50 *N.J.* at 547. We noted that the owner's expectation is reasonable and consistent with the broker's expectation as to the kind of purchaser his engagement requires him to tender to the owner. *Id.* A seller seeks a buyer who is able to close, not merely one who is able to sign a contract, and the risk of a financially incapable purchaser should be borne by the broker. Accordingly, we held that a seller's liability for the commission will arise only if the sale is consummated, unless the title "does not pass because of the owner's improper or frustrating conduct." *Id.* at 548.

> When a broker is engaged by an owner of property to find a purchaser for it, the broker earns his commission when (a) he produces a purchaser ready, willing and able to buy on the terms fixed by the owner, (b) the purchaser enters into a binding contract with the owner to do so, and (c) the purchaser completes the transaction by closing the title in accordance with the provisions of the contract. If the contract is not consummated because of lack of financial ability of the buyer to perform or because of any other default of his, * * *

---

[4]The rationale of the early decisions as to a broker's right to a commission is discussed in Note, *"Ellsworth Dobbs, Inc. v. Johnson:* A Reexamination of the Broker-Buyer-Seller Relationship in New Jersey," 23 *Rutgers L.Rev.* 83, 87–88 (1968).

*there is no right to commission against the seller. On the other hand, if the failure of completion of the contract results from the wrongful act or interference of the seller, the broker's claim is valid and must be paid. In short, in the absence of default by the seller, the broker's right to commission against the seller comes into existence only when his buyer performs in accordance with the contract of sale.*

*\* \* \* The basic law governing the owner-broker relationship is declared to be that absent default by the owner, the contract of sale must be performed by the buyer before liability for commission is imposed upon the owner. [Id. at 551 (emphasis added).]*

Appellant argues that the lower courts in this case have misapplied the standard for imposing liability on a seller for a brokerage commission in an aborted real estate transaction. Although *Ellsworth Dobbs* does not elaborate on the concept of seller default, inasmuch as the purchaser was the defaulting party, other decisions make it clear that a seller does not become liable for a commission merely because its conduct is a contributing factor in the breakdown of the sales transaction.[5]

For example, if a seller is unable to convey clear title, the seller is the defaulting party as a matter of law. *See Conklin v. Davi,* 76 *N.J.* 468 (1978); *La Salle v. La Pointe,* 14 *N.J.* 476 (1954). Nevertheless, this type of default does not necessarily result in liability to the broker where title does not pass. *See, e.g., Blau v. Friedman, supra,* 26 *N.J.* at 402–04 (seller who has acted in good faith and with reasonable belief that legal power to convey existed had not engaged in willful conduct that prevented consummation of sale; therefore, seller not necessarily liable to broker for sales commission); *Lippincott v. Content, supra,* 123 *N.J.L.* at 279 (broker could not recover commission where seller not successful in action to quiet title of land to be conveyed); *Murray Apfelbaum, Inc. v. Topf,* 104 *N.J.L.* 343, 346–47 (E. & A.1928) (defect in title "does not *per se* determine the right of broker to be paid a commission \* \* \* unless it is made to appear that the vendor, when he entered into the contract with the real estate broker *fraudulently*

---

[5]Because these cases examine seller default in the context of the passing of title being considered a condition precedent to the payment of a brokerage commission, their principles are relevant to the issue before us.

concealed the fact of the existence of the restrictions on the property, or by some other *willful* act prevented the title from passing and the sale from being consummated.") (emphasis added); *Alexander Summer Co. v. Weil, supra,* 16 *N.J.Super.* at 99 (proof of title defect or failure of owner to disclose defect to broker does not constitute willful or fraudulent acts, or purely capricious refusal to act, so as to create liability of owner to broker); *cf. Century 21–Candid Realty v. Cliett,* 203 *N.J.Super.* 78, 80–81 (Law Div.1985) (seller has right to cancel real estate contract for any reason or no reason pursuant to attorney's advice and in reliance upon attorney review clause without subjecting himself to commission liability).

A court has also applied the "fraudulent-willful" terminology in a situation in which the seller has innocently misrepresented the quantity of land to be conveyed. *Gottlieb v. Connoly,* 5 *N.J.Misc.* 372 (Sup.Ct.1927). In that case, the seller and the prospective purchaser entered into a contract for the sale of property for $7,000. In the contract, the amount of land was recited as "seven acres more or less." The seller agreed to pay the broker a $600 commission. When a subsequent survey revealed that the land contained actually fewer than five acres, the prospective purchaser refused to accept the deed but released the seller from his contractual obligations. The court denied the broker's action to recover a commission, finding that "the misunderstanding as to the amount of the land was a mistake in fact and not induced by fraud." *Id.* at 374. As in the title-defect cases, the duty of the seller was restricted to an avoidance of intentional wrongdoing.

These decisions suggest that "liability should not be imposed on the seller when he acts in good faith and his inability to perform is not related to any wrongful act or misconduct on his part." *Rothman Realty Corp. v. Bereck,* 73 *N.J.* 590, 601–02 (1977). In contrast, where a seller's default is attributable to wrongful conduct, he has been held liable for the broker's commission. *See, e.g., Blau v. Friedman, supra,* 26 *N.J.* at 401 (presence of contingency clause "will not prevent recovery by

broker if the sale is defeated by the seller's own willful conduct."); *Mathis v. Yarak*, 71 *N.J.Super.* 234, 238 (App.Div. 1961) (vendor liable to broker for commission where vendor breached sales contract by arbitrarily refusing to sign F.H.A. form for purchaser, and sales contract contemplated purchaser's obtaining F.H.A. mortgage); *Bruni v. Posluszny*, 56 *N.J. Super.* 525, 531 (App.Div.1959) ("The right to a commission * * * cannot be defeated if the occurrence of the contingency is willfully prevented by the misrepresentation or conduct of the broker's principal."); *Beckmann v. (Zinke's) Rainbow's End, supra*, 40 *N.J.Super.* at 200 (broker's commission cannot be defeated by "misrepresentations, or capricious acts of the principal which alone occasioned a rescission of the contract of sale.") (citations omitted); *Marschalk v. Weber*, 11 *N.J.Super.* 16, 25 (App.Div.1950) (vendor cannot unjustly escape broker liability by means of his own "malfeasance or purely capricious refusal to perform his agreement."); *Keifhaber v. Yannelli*, 9 *N.J.Super.* 139, 141–42 (App.Div.1950) (vendor liable for broker's commission where sale not consummated because vendor failed to even attempt to remove tenants from first floor apartment of building that was subject to transaction, despite the fact that contract warranted such a vacancy); *Hinds v. Henry, supra*, 36 *N.J.L.* at 332 (seller cannot defeat broker's right to compensation "by a refusal, without sufficient reason to fulfill the agreement.").

Where the seller's conduct can be characterized as "wrongful," "fraudulent," "willful," or "capricious," the relief granted to the broker is equitable in nature and based on the principle of estoppel: "One who actively prevents the occurrence of a condition cannot rely on the non-occurrence of that condition to avoid liability." Note, *"Ellsworth Dobbs, Inc. v. Johnson:* A Reexamination of the Broker-Buyer-Seller Relationship in New Jersey," 23 *Rutgers L.Rev.* 83, 90 (1968); *see Beckmann v. (Zinke's) Rainbow's End, supra*, 40 *N.J.Super.* at 199–200; *Keifhaber v. Yannelli, supra*, 9 *N.J.Super.* at 142; *cf. Roth-*

*man Realty Corp. v. Bereck, supra,* 73 *N.J.* at 602–03 (buyer cannot defraud or cheat broker out of commission).

## III

■ Our analysis of the record compels the conclusion that the failure to consummate the sales transaction in this case was not the result of any wrongful conduct on the part of GBR. Initially, we focus on GBR's conduct in the context of the sales contract. Ordinarily, there is no reason to elevate the rights of the broker to a level higher than that of the parties to the contract of sale.[6] As we noted in *Harris v. Perl,* 41 *N.J.* 455, 462 (1964), "[t]he economic facts and expectations of fair men with respect to real estate brokerage are clear enough. The role of the broker is to bring buyer and seller together at terms agreeable to both, and \* \* \* the broker expects to earn a commission from the seller if he succeeds." Accordingly, even if the failure to close title is attributable to the seller's acts or omissions, the broker's commission claim will generally be denied if the seller has not breached the contract of sale.[7]

■ In this case the contract of sale conditioned the transaction on the SBA's release of its mortgage lien "upon terms which are satisfactory to the Seller, in its sole discretion, by

---

[6] See discussion in Note, *"Ellsworth Dobbs, Inc. v. Johnson," supra* note 4, at 91–92 and n. 61.

[7] *See, e.g., Ellsworth Dobbs, supra,* 50 *N.J.* at 551 ("[I]n the absence of default by the seller, the broker's right to commission against the seller comes into existence only when his buyer performs in accordance with the contract of sale."); *Houston v. Siebert,* 129 *N.J.L.* 468, 472 (E. & A.1943) ("The law is firmly settled in this state that a real estate broker earns his commission when he secures a buyer on the seller's terms, either as originally propounded or as settled by agreement between the seller and buyer.") (quoting *Dickinson v. Walters,* 100 *N.J.L.* 62, 65 (Sup.Ct.1924)); *Joseph Hilton & Assocs., Inc. v. Evans,* 201 *N.J.Super.* 156, 167–68 (App.Div.1985) (compilation of cases expressing proposition that broker is entitled to commission not only on terms of listing agreement, but on other terms agreed upon by the buyer and seller); *Fry v. Doyle,* 167 *N.J.Super.* 486, 495 (App.Div.) (a broker "does not lose his commission, assuming the transaction is ultimately consummated, where he procures for the owner a purchaser ready, willing and able to comply on terms other than or different from those originally specified, but which are satisfactory to the owner.") (citing *Beckmann v. (Zinke's) Rainbow's End, Inc., supra,* 40 *N.J.Super.* at 196), certif. denied, 81 *N.J.* 287 (1979); *Brenner and Co. v. Perl,* 72 *N.J.Super.*

July 7, 1980," and imposed on GBR the duty to use its best efforts to secure that release. There has been no claim by the purchaser that GBR breached the contract of sale in this regard. The record sustains GBR's contention that it employed substantial efforts to gain the release of the SBA mortgage.

Since GBR did not breach its contract with the buyer, respondent's claim rests on its contention that the terms proposed by GBR for the substitution of collateral, although authorized by the contract, were nevertheless unreasonable and inconsistent with GBR's duty to the broker. We find this contention utterly unsupported by the record. GBR proposed to substitute tax exempt securities, purchased from the proceeds of the sale, for the property securing the SBA loan.[8] Since GBR had not acquired the property with the loan proceeds, the SBA's and the trial court's concern that the low interest loan funds were being used to buy tax exempt securities is without foundation. It is also significant that the proposed collateral was equivalent in value to the real estate and was substantially more liquid. Moreover, the proposal to the SBA would preclude any purchases or sales of the securities without SBA approval.

---

160, 165 (App.Div.1962) ("A realty broker only earns his commission when, pursuant to a written agreement, he produces a buyer, able and willing to purchase on terms satisfactory to the owner.") (citations omitted); *Mack v. Revicki*, 47 *N.J.Super.* 185, 192 (App.Div.1957) ("It has long been the rule that a broker earns his commission when by written agreement he produces a buyer, able and willing to purchase on terms satisfactory to the owner.") (citations omitted); *Alexander Summer Co. v. Weil, supra,* 16 *N.J.Super.* at 98 ("[A] real estate broker * * * earns his commission when he procures for the owner a purchaser able and willing to comply with the terms specified in the authority thus conferred, or with other or different terms which, however, are satisfactory to the owner."); *Kiefhaber v. Yannelli, supra,* 9 *N.J.Super.* at 142 (vendor liable for commission where vendor fails to perform under contract of sale); *Schwenn v. S. Goldberg & Co., Inc.,* 88 *N.J.Super.* 113, 119–20 (Law Div.1965) (vendor-broker commission liability principles apply only in cases where the buyer and seller have agreed on terms of sale acceptable to both), aff'd on opinion below, 91 *N.J.Super.* 346 (App.Div.), certif. denied, 48 *N.J.* 111 (1966).

[8]Bornstein testified that during the negotiations for closing the SBA loan, SBA representatives indicated that if GBR's payment record was satisfactory, the SBA would consider in the future the release of part of the collateral or substitution of collateral.

· [3] We find nothing about this proposal to be unreasonable or capricious, or so lacking in good faith as to constitute a breach either of the contract or of the seller's duty to its broker. The fact that the SBA found the proposal unacceptable is irrelevant. The seller's duty in this case was to put forth reasonable terms for the release of the SBA lien and use its best efforts to obtain the SBA's consent. It would be difficult to conceive of a proposal for the release of the SBA lien that would violate GBR's duty to its broker without simultaneously constituting a breach of its contractual duty to the buyer. In our view, the proposal rejected by the SBA was consistent with the seller's obligation to both the buyer and the broker.

■ We hold that absent bad faith or special circumstances, the threshold standard for imposing liability on a seller for a brokerage commission in an aborted real estate transaction is a finding that the seller committed a breach of the sales contract. As indicated, not every contractual breach by a seller will result in liability for the commission. The seller's breach may be innocent or unavoidable and therefore not qualitatively sufficient to justify liability for the brokerage commission. See discussion, *supra*, at 345–347. But the contract of sale must be the benchmark for the seller's liability, since it defines the terms of the transaction the consummation of which entitles the broker to payment. In this case the seller's conduct was totally consistent with its obligations under the contract of sale.

For the reasons stated, the judgment of the Appellate Division is reversed.[9]

*For reversal*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*For affirmance*—None.

---

[9]In view of our disposition, we need not address the questions concerning the alleged breach of fiduciary duty by Van Winkle or GBR's alleged waiver of its rights resulting from that breach.