FLAGSTAFF REALTY, INC., PLAINTIFF–RESPONDENT, v. CORA NED, MAYRA BROWN, DEFENDANTS–APPELLANTS, AND MYRON NED AND MARTY NED, DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Argued October 5, 1987—Decided October 28, 1987.

Before Judges BAIME and ASHBEY.

*Ellen Boylan* argued the cause for appellants (Hudson County Legal Services Corp., *Timothy K. Madden*, Director, attorneys; *Ellen Boylan*, on the brief).

No brief submitted on behalf of respondent.

The opinion of the court was delivered by

BAIME, J.A.D.

Plaintiff Flagstaff Realty, Inc. instituted this action in the Superior Court, Law Division, Special Civil Part, to recover a

real estate brokerage commission. Named as defendants were Cora Ned, her two sons, Myron Ned and Marty Ned, and her daughter, Mayra Brown. The gist of plaintiff's complaint was that, acting as a licensed real estate broker, it had produced a buyer ready, willing and able to purchase property owned by defendants as tenants in common, that defendants and the buyer had entered into a binding contract and that defendants had wrongfully repudiated the agreement. Following a trial, the judge issued a written opinion in which he concluded that defendants had wrongfully refused to consummate the transaction and were thereby responsible for plaintiff's loss of its commission. Judgment was entered accordingly.[1] We are constrained to reverse.

The salient facts can be briefly stated. Cora Ned, a 55 year-old widow, purchased her Jersey City home some 25 years ago. Following the death of her husband, Cora at some point decided to place the names of her three children on the deed to the property. While the property was thereafter held as tenants in common, Cora retained both the decision-making authority concerning the house and the responsibility for payment of all of the bills.

Cora has a long history of mental illness. She has been diagnosed as a paranoid schizophrenic who suffers from delusions of persecution, hallucinations and suicidal thoughts. Because of the severity of her condition, Cora has been hospitalized for extensive periods on numerous occasions. When not hospitalized, Cora undergoes monitoring and treatment by the Mount Carmel Guild. The treatment consists generally of

---

[1] At the time that the summons and complaint were served upon Cora Ned, Myron Ned and Mayra Brown, Marty Ned no longer lived in the Jersey City house. Apparently, he is a homeless person who presently stays in New York City. It is apparent that he was not served with process. The trial judge reserved decision on plaintiff's motion to enter default judgment against Marty Ned. The record does not reflect whether that motion was later decided.

psychotherapy and the administration of large quantities of psychotropic drugs. While the outward manifestations of the disease can be controlled and ameliorated to some extent, the underlying thought disorder is essentially incurable.

In the fall of 1985, Cora suddenly decided to sell her house, apparently because of the anxiety she felt about paying her bills, especially her mortgage. Cora placed the house on the market under a non-exclusive listing agreement with another broker. The record reflects that she gave only one day of thought before deciding to list the house, that she did not discuss the sale of the property with her children and that she never considered where she would reside thereafter.

In any event, a representative of plaintiff subsequently produced a buyer who entered into a contract of sale with Cora and her three children. The contract provided that plaintiff was to earn a 3.75% commission "due and payable upon closing of the title." Both parties had attorneys review the contract and none of the sellers expressed any reservations concerning the sale.

On the day before she signed the contract, Cora visited her psychiatrist, Dr. Julio Arla, at the Mount Carmel Guild. At trial, Dr. Arla testified that Cora did not apprise him of the fact that she intended to sell her house. He noted that during the visit Cora was extremely unstable and was suffering from hallucinations and the effect of chronic insomnia. According to Dr. Arla, "[s]he was afraid of the voices [she was hearing] and had suicidal thoughts."

After signing the contract, Cora's condition deteriorated substantially. The record reflects that she was unable to eat or bathe and was virtually bed-ridden during this period. Accompanied by her daughter, Cora visited Dr. Arla at his office on January 16, 1986. Dr. Arla testified that Cora appeared "greatly agitated," that "she couldn't stand still in [his] office" and that she was "psychotic and incoherent." He attributed her deteriorating condition to the proposed sale of her house. Although the record is not entirely clear, it would appear that Cora was eventually hospitalized.

Cora's attorney was contacted immediately following her visit with Dr. Arla. He ultimately was able to negotiate a release from the buyer in exchange for $2,198. Plaintiff insisted on payment of its commission, however, and brought this action when defendants refused.

In his written opinion, the trial judge concluded that Cora's "conduct was wrongful in that she breached the sales contract for no reason other than that she experienced a change of mind." The judge determined that, despite "credible testimony" concerning Cora's condition of paranoid schizophrenia, the cause of her repudiation of the agreement "was not necessitated by or attributable to her mental condition." In that regard, the judge placed great emphasis upon the testimony of plaintiff's representative, who witnessed the signing of the contract, that on that date Cora "acted in a normal manner and understood the nature of the circumstances and her role" in the transaction. The judge reasoned that Cora's subsequent breach of the contract was predicated upon her understanding "that the amount that would be realized by the sale would not be as substantial as she had anticipated" and that "she would have a difficult time finding another place in which to live."

We are thoroughly convinced from our careful reading of the record that the trial judge erred both in his application of the controlling legal principles and in his factual determinations. The seminal decision concerning the triadic relationship between the seller, buyer and real estate broker is *Ellsworth Dobbs, Inc. v. Johnson*, 50 *N.J.* 528 (1967). There, our Supreme Court abrogated the century-old rule that when a broker who has been duly authorized by the owner to find a buyer for his property produces a willing and able purchaser who enters into a contract to buy on terms agreeable to the owner, the broker has fulfilled his undertaking and his right to commission from the owner is complete. *Id.* at 543. The Court noted that "ordinarily when an owner of property lists it with a broker for sale, his expectation is that the money for the payment of commission will come out of the proceeds of the sale." *Id.* at

547. So posited, the Court determined that "a more realistic approach to the problem [was] necessary." *Ibid.* The Court thus adopted the following rule:

When a broker is engaged by an owner of property to find a purchaser for it, the broker earns his commission when (a) he produces a purchaser ready, willing and able to buy on the terms fixed by the owner, (b) the purchaser enters into a binding contract with the owner to do so, and (c) the purchaser completes the transaction by closing the title in accordance with the provisions of the contract. If the contract is not consummated because of lack of financial ability of the buyer to perform or because of any other default of his, ... there is no right to commission against the seller. On the other hand, if the failure of completion of the contract results from the wrongful act or interference of the seller, the broker's claim is valid and must be paid. [*Id.* at 551.]

The *Ellsworth Dobbs* decision was followed by *Rothman Realty Corp. v. Bereck,* 73 *N.J.* 590 (1977). There, the Court confronted the question whether a broker could recover its commission against a buyer who had defaulted on his contract with the seller because of an unanticipated financial calamity which rendered him unable to consummate the transaction. The Court noted that under such circumstances, "it [was] conceivable that the buyer may be liable to the seller for refusal to perform the purchase contract and [yet] not be responsible to the broker." *Id.* at 600. The Court concluded that:

[t]o imply an obligation on the part of a buyer that he will pay the broker a commission, even though the buyer has acted in good faith with every intendment of acquiring the premises, but is unavoidably through no fault of his own prevented from consummating the purchase, is unquestionably contrary to the buyer's expectable understanding when he engages the broker. [*Id.* at 601].

The Court determined that the buyer had been guilty of no "wrongdoing" and therefore was not liable to the broker for the commission. *Id.* at 601–602.

The trilogy was completed in *Van Winkle & Liggett v. G.B.R. Fabrics, Inc.,* 103 *N.J.* 335 (1986). At issue was whether a broker could recover its commission against a seller who was unable to close title because of the refusal of the Small Business Administration to accept the substitution of other collateral for its lien on the subject property. Citing its prior decisions in *Ellsworth Dobbs* and *Rothman Realty,* the Court stated that "liability should not be imposed on the seller where

he acts in good faith and his inability to perform is not related to any wrongful act or misconduct on his part." *Id.* at 345 quoting *Rothman Realty Corp. v. Bereck, supra,* 73 *N.J.* at 601–602. The Court reasoned that "[w]here the seller's conduct can be characterized as 'wrongful,' 'fraudulent,' 'willful,' or 'capricious,' the relief granted to the broker is equitable in nature and based on the principle of estoppel...." *Id.* 103 *N.J.* at 346. In contrast, where the seller's default is not attributable to wrongful conduct, no principle of law or equity commands that he be responsible to the broker for its commission. *Id.* at 349. The Court thus held that:

[A]bsent bad faith or special circumstances, the threshold standard for imposing liability on a seller for a brokerage commission in an aborted real estate transaction is a finding that the seller committed a breach of the sales contract. [However,] *not every contractual breach by a seller will result in liability for the commission. The seller's breach may be innocent or unavoidable and therefore not qualitatively sufficient to justify liability for the brokerage commission.* [*Id.* at 349; emphasis supplied].

Applying these principles here, we are fully convinced that defendants' refusal to consummate the sales transaction was both innocent and unavoidable. Assuming, as the trial judge found, that Cora was competent at the time defendants entered into the contract, *see Manufacturers Trust Co. v. Podvin,* 10 *N.J.* 199, 207 (1952), her subsequent mental and emotional collapse and the sellers' consequent unwillingness to close title can hardly be characterized as "fraudulent," "willful," or "capricious" conduct. *Van Winkle & Liggett v. G.R.B. Fabrics, Inc., supra,* 103 *N.J.* at 346. We would be short on realism were we to fail to recognize one of life's more tragic vicissitudes. The law does not bind us to such myopia. Whatever may be said regarding the outermost boundaries of the rule set forth in *Van Winkle,* we are convinced that defendants' inability to consummate the contract was both innocent and unavoidable. We hold that the rapid deterioration in Cora's condition excused the sellers from what otherwise would have been their obligation to pay the real estate brokerage commission.

We are not unmindful of the trial judge's conclusory finding that the sellers' repudiation of the contract "was not necessitat-

ed by or attributable to [Cora's] mental condition." We also recognize the limited nature of our appellate function in reviewing the factual findings and legal conclusions of the trial judge. *See Rova Farms Resort v. Investors Ins. Co.*, 65 *N.J.* 474, 484 (1974); *Brundage v. The New Jersey Zinc. Co.*, 48 *N.J.* 450, 478 (1967); *New Jersey Turnpike Authority v. Sisselman*, 106 *N.J.Super.* 358, 370 (App.Div.1969), certif. den. 54 *N.J.* 565 (1969). Nevertheless, we are thoroughly satisfied that the trial judge's finding was clearly a mistaken one and was so plainly unwarranted that the interests of justice demand intervention and correction. *State v. Johnson*, 42 *N.J.* 146, 162 (1964). We emphasize that the nature and extent of Cora's mental and emotional collapse following her execution of the contract was both well-documented and uncontradicted. In his written opinion, the trial judge specifically alluded to the "credible testimony" presented in that respect. While perhaps Cora was competent at the time she entered into the contract, the subsequent deterioration of her mental condition was essentially undisputed. In sum, we are convinced that a clear mistake was made and a plainly unjust result was reached.

Accordingly, the judgment of the Special Civil Part is reversed.