**Brenda Delores BUTLER, et al., Appellants,**

v.

**Luther HARRISON, et al., Appellees.**

No. 87–1033.

District of Columbia Court of Appeals.

Argued June 12, 1990.
Decided July 13, 1990.

Howard B. Silberberg, McLean, Va., for appellants.

Keith B. Grimes, with whom John A. Waller, Washington, D.C., was on the brief, for appellees.

Before ROGERS, Chief Judge, NEWMAN and FARRELL, Associate Judges.

ROGERS, Chief Judge:

Appellants, beneficiaries under Mrs. Hattie Harrison's will, appeal from the denial of their request to set aside the April 8,

1982, quitclaim deed signed by Mrs. Harrison on the ground that she lacked the necessary mental capacity and was unduly influenced by her husband to transfer the real property to herself and to him as tenants by the entirety. We affirm.

I

Mrs. Harrison, her husband, and her son, Edward C. Calhoun, acquired 1426 C Street, N.E., as joint tenants in 1946. By quitclaim deeds dated December 7, 1973 and January 31, 1974, Mr. Harrison and Mr. Calhoun conveyed their interests in the property to Mrs. Harrison as sole owner. On April 8, 1982, Mrs. Harrison conveyed title to Mr. Harrison and herself as tenants by the entirety by a quitclaim deed recorded April 12, 1982. Mrs. Harrison died testate on November 27, 1984, at the age of 74. Pursuant to her will, executed on January 22, 1974, appellants, Mrs. Harrison's son and her grandchildren, were to receive the C Street property subject to a life estate in Mr. Harrison. Mr. Harrison died testate on March 4, 1985, devising all of his property, including the C street property, to appellees, Luther Harrison and Jessier Mae Price, his brother and sister. Appellants filed a complaint to set aside the April 8, 1982, quitclaim deed on the ground that Mrs. Harrison suffered from senile dementia when she executed the deed and consequently lacked the mental capacity to execute it and, further, was unduly influenced by Mr. Harrison.

At trial, Mr. Calhoun testified that sometime in 1980 his mother began to lose her concentration during conversations, would forget who he was, and would be forgetful and withdrawn. He also testified, however, that Mrs. Harrison's confusion would "come and go." Mrs. Harrison's granddaughters offered similar testimony. They explained by way of example that beginning in 1980, Mrs. Harrison would lose her way going places and eventually had to stop driving. Once, she took her husband to the bank but left alone, forgetting that he was with her. However, the granddaughters also stated that when Mrs. Harrison was in the hospital in May 1982, she recognized them and engaged in conversation "like a normal visit," complaining about the food and conditions at the hospital. Further testimony indicated that the Harrisons were a loving couple and that Mrs. Harrison had managed the couple's financial and household affairs as Mr. Harrison was unable to read and write. Evidence also showed that Mrs. Harrison was hospitalized from May 27, 1982, to June 5, 1982, when she was diagnosed as suffering from an "altered mental state" and "probably senile dementia," and again in October 1982, when her diagnosis as suffering from a noncorrectable form of dementia was confirmed.

Dr. Josephine King, the attending physician during Mrs. Harrison's first hospitalization, who supervised Mrs. Harrison's treating physicians but had no personal contact with her, testified that Mrs. Harrison's condition prevented her from thinking in an analytical, coordinated fashion and that she suffered from a loss of recent and distant memory. Dr. King interpreted the medical records from the first hospitalization as showing that Mrs. Harrison was disoriented as to person, place, and time, and totally confused throughout her initial hospital stay, and noted that a CAT scan demonstrated some atrophy of her brain which is commonly associated with such symptoms. She testified, however, that in May 1982, Mrs. Harrison, although totally confused, could carry on a conversation with her family and the doctors. Dr. King did not think that she was qualified to comment on Mrs. Harrison's mental capacity prior to her hospital admission and offered no opinion.

Dr. Samuel Scott, Mrs. Harrison's treating physician during her second hospitalization, five months after she executed the deed at issue, found Mrs. Harrison to be totally disoriented as to time and place, that she did not know what season of the year or what year it was, and that she was unable to concentrate or engage in intellectual functions. Dr. Scott concluded that when he saw her in October 1982, she lacked the mental capacity to understand the legal nature of a document and deduced, based on her then present condition,

that her mental capacity to understand such a document back in April 1982 was "doubtful" at best.[1]

Appellees offered the evidence of Mr. Harrison's brother, Luther, who testified about visiting Mrs. Harrison at her home several times a week in 1982 and at the hospitals. According to him, Mrs. Harrison always knew who he was and asked how he was doing and otherwise seemed all right. Sterling W. Perry, Esquire, who had provided legal services for Mr. and Mrs. Harrison in the past and prepared the deed signed by Mrs. Harrison on April 8, 1982, in Ms. Perry's office, also testified. Ms. Perry remembered nothing unusual about Mrs. Harrison's behavior on the day she executed the deed and testified that she had explained the contents of the deed to Mrs. Harrison and advised her about the deed's legal effect. Ms. Perry testified that while she had no medical training, she thought, based on her regular office procedure, that Mrs. Harrison was "fit" to sign the deed since otherwise she would not have allowed her to sign it. Neither witness had been aware of Mrs. Harrison's dementia condition.

The trial judge declined to set aside the April 8, 1982, quitclaim deed, ruling that appellants had failed to meet their burden of proof to show by a preponderance of the evidence that Mrs. Harrison lacked the mental capacity to execute the deed. The judge found that the only evidence relating to her lack of mental capacity was the medical opinion of the two doctors. Dr. Scott's opinion, the judge noted, was not based on any first-hand knowledge of Mrs. Harrison's physical condition during "the critical period in question," but rather on his interpretation of her medical records during her first hospitalization a month after she executed the April 1982 deed. Similarly, the judge noted that Dr. King had no direct knowledge of Mrs. Harrison's mental condition and could not give an

opinion of Mrs. Harrison's mental capacity on April 8, 1982.

Further, the trial judge ruled that appellants' lay opinion about Mrs. Harrison's mental condition during the time she executed the deed was insufficient to prove her lack of mental capacity. While there was consistent testimony that Mrs. Harrison's alertness was deteriorating as of December 1981 and thereafter, there also was evidence, the judge noted, that she had both good and bad days. In addition, the judge noted that Ms. Perry, who was familiar with Mrs. Harrison and drafted and witnessed the execution of the deed, had testified that she remembered no irregularities when Mrs. Harrison signed the deed. The judge also noted the evidence that the Harrisons enjoyed a loving and harmonious marital relationship over forty years and that Mrs. Harrison was the manager of their affairs. Finally, the judge found that appellants had failed to present any credible evidence to support their claim that Mr. Harrison had exercised undue influence over Mrs. Harrison, who appeared to be the dominant personality among the two.

## II

■ The test of mental capacity to contract is whether the person in question possesses sufficient mind to understand, in a reasonable manner, the nature, extent, character, and effect of the particular transaction in which she is engaged, *see, e.g., Lynn v. Magness,* 191 Md. 674, 682–683, 62 A.2d 604, 608 (1948); *Oswald v. Seidler,* 135 N.J.Eq. 490, 491–493, 39 A.2d 396, 398 (1944), *rev'd on other grounds,* 136 N.J.Eq. 443, 42 A.2d 216 (1945); 17 C.J.S. *Contracts* § 133(1) (1963), whether or not she is competent in transacting business generally. *See* RESTATEMENT (SECOND) OF CONTRACTS § 15 comment b (standard of competency) (1979). It is presumed that an adult is competent to enter into an agreement and the burden of proof is on the

---

**1.** Dr. Scott explained that the initial stages of dementia are usually marked by the loss of memory of minor things and names. As the disease progresses the symptoms grow more severe and can cause victims to become disoriented, forgetting such things as where they are,

a course which eventually leads to death. Dr. Scott defined dementia as involving impairment of orientation, judgment, mental capacity, ability to abstract ideas and to concentrate and make rational decisions.

party asserting incompetency. *See Lynn v. Magness, supra,* 191 Md. at 680–681, 62 A.2d at 607; *McGovern's Estate v. State Employees' Retirement Bd.,* 512 Pa. 377, 385–386, 517 A.2d 523, 526 (1986); RESTATE-MENT (SECOND) OF CONTRACTS, *supra,* comment c. Further, the party asserting incompetency must show not merely that the person suffers from some mental disease or defect such as dementia, but that such mental infirmity rendered the person incompetent to execute the particular transaction according to the standard set forth above. *See Weakley v. Weakley,* 355 Mo. 882, 886–887, 198 S.W.2d 699, 702 (1947). This court will reverse only if the trial court's findings are clearly erroneous. *Santucci v. Pignatello,* 88 U.S.App.D.C. 190, 191, 188 F.2d 643, 644 (1951); *Flagstaff Realty, Inc. v. Ned,* 226 N.J.Super. 294, 298–299, 544 A.2d 385, 388 (1987). D.C.Code § 17–305 (1989 Repl.). We find no such error.

■ While a person's prior and subsequent condition may be inquired into for the purpose of reflecting on her mental state at the time in question, *Boynton v. Burrows,* 83 U.S.App.D.C. 227, 228, 167 F.2d 759, 760 (1948), and lay opinion testimony is admissible on the issue of mental capacity, *In re Estate of Wilson,* 416 A.2d 228, 236 n. 14 (D.C.1980), there was no direct evidence concerning Mrs. Harrison's mental condition on the date she executed the quitclaim deed other than Ms. Perry's recollection that nothing unusual happened. Although there was evidence that Mrs. Harrison suffered from a disease resulting in progressive mental incompetency and that her mental capacity around April 1982 was marked by alternating periods of confusion and lucidity, the trial judge could properly give greater credence to the testimony of lay persons who saw Mrs. Harrison at the relevant time than to medical testimony regarding her condition five months later. *Atchison & Keller, Inc. v. H.G. Smithy Co.,* 243 A.2d 46 (D.C.1968) (trial court to weigh the evidence, including the testimony of experts, and to judge the credibility of witnesses). *See McGovern's Estate v. State Employees' Retirement Bd., supra,* 512 Pa. at 385–386, 517 A.2d at 527 (evidence that Mr. McGovern may have been incompetent at certain intervals insufficient in light of evidence that he was lucid and understood the terms of the retirement contract on the date in question). *Compare Flagstaff Realty, Inc. v. Ned, supra,* 226 N.J.Super. at 299–300, 544 A.2d at 388–89 (well-documented and uncontradicted evidence of emotional collapse involving extreme instability, hallucinations, chronic insomnia, suicidal thoughts and psychoses occurring directly after execution of the contract warranted reversal of trial court's finding of mental competence). In support of the judge's findings, there was evidence from Mrs. Harrison's son and grandchildren as well as her brother-in-law, all of whom saw her in 1982 around the time she executed the deed, that Mrs. Harrison's mental competency fluctuated, evidence from her attorney that nothing seemed amiss when she signed the deed on April 8, 1982, and evidence from Dr. King that a month later she was still able to carry on conversations with her doctors and family. As Mrs. Harrison told the hospital admitting staff in May 1982, her memory "comes and goes." Moreover, nothing in the record suggests that Mrs. Harrison's action in executing the April 8, 1982, deed was a bizarre conveyance. *See McGovern's Estate v. State Employees' Retirement Bd., supra,* 512 Pa. at 385–386, 517 A.2d at 527 (irrational disposition not grounds for altering disposition by decedent alleged to be incompetent).

Appellants' claims of error by the trial judge do not amount to clear error. The judge's reference in her order to Dr. Scott's unfamiliarity with Mrs. Harrison's *physical* condition does not indicate a fatal flaw in her conclusions since her order accurately reflected that the issue before her was Mrs. Harrison's mental competency and Dr. Scott had testified about the physical atrophy of Mrs. Harrison's brain during her second hospitalization. The judge also did not err in stating that Dr. Scott lacked personal knowledge of Mrs. Harrison's condition in April 1982 and possessed firsthand knowledge based solely on his examination of her in October 1982; the judge

noted that the doctor's personal knowledge involved a period five months after the relevant period. Further, contrary to appellants' contention, the trial judge did not abuse her discretion in sustaining an objection to testimony about Mrs. Harrison's condition nearly one and one-half years after she executed the quitclaim deed. As the judge correctly explained, that evidence was "very remote in time to the critical time in question."

▪ As to appellants' claim that Mr. Harrison exercised undue influence over his wife, appellants can point to no evidence in the record that Mr. Harrison exercised undue influence over Mrs. Harrison in her decision to execute the deed. *MacMillan v. Knost,* 75 U.S.App.D.C. 261, 262, 126 F.2d 235, 236 (1942) (suspicion of undue influence is insufficient). Confidential relations alone are insufficient in the absence of proof of coercion. *Id.; see Himmelfarb v. Greenspoon,* 411 A.2d 979, 983–84 (D.C. 1980) (undue influence in estate law defined as amounting to physical or moral coercion that destroys the testator's agency and free will and forces the testator to exercise the judgment of another rather than his own) (citations omitted). Consequently, we find no clear error by the trial judge in ruling that the evidence does not support such a finding.

Accordingly, the judgment is affirmed.