In re Loraine Boley INGERSOLL TRUST.

William B. Ingersoll, et al., Appellants,

v.

Barbara J. Ingersoll, Appellee.

Nos. 05–PR–263, 05–PR–337, 05–PR–756.

District of Columbia Court of Appeals.

Argued Sept. 26, 2006.

Decided June 19, 2008.

**674**

Philip M. Musolino, with whom Lisa J. Dessel and Rena Schild, were on the brief, for the Ingersoll appellants.

Bennett Rushkoff, Assistant Attorney General, District of Columbia, with whom Robert J. Spagnoletti, Attorney General at the time the brief was filed, and Edward E. Schwab, Deputy Attorney General, Appellate Division at the time the brief was filed, for appellant, District of Columbia.

Michael F. Curtin, with whom Mark S. Carlin, was on the brief, Washington, for appellee.

David W. Wilmot filed a brief for amicus curiae Marriott Hospitality Public Charter High School, in support of appellants.

Before RUIZ, REID and FISHER, Associate Judges.

REID, Associate Judge:

These consolidated cases primarily involve a trust established by Loraine Boley Ingersoll prior to her death, a family foundation created under that trust, and a lawsuit filed by her daughter, appellee, Barbara J. Ingersoll, against her brothers, appellants, William B. Ingersoll, Henry G. Ingersoll, and Joseph W. Ingersoll, as well as against appellant, the District of Columbia. The Ingersoll brothers challenge several findings and conclusions of the trial court, dated December 9, 2004, including those relating to William's alleged undue influence over his mother, his alleged tortious interference with Barbara's inheritance of residential property, and his mother's testamentary intent; they also contest aspects of the trial court's judgment of February 25, 2005 (Appeal No. 05–PR–337). Furthermore, the Ingersoll brothers appeal trial court orders, dated May 4, 2005 and mailed on July 8, 2005, denying motions pertaining to their counterclaim which sought to restore to their mother's estate certain proceeds—mainly from a mutual funds account and a bank account (Appeal No. 05–PR–756). The District's appeal involves the trial court's

judgment of February 25, 2005, as it related to a charitable family foundation created and funded out of assets from Mrs. Ingersoll's estate (Appeal No. 05–PR–263).

We are constrained to conclude that certain of the trial court's findings are not supported by the record and are clearly erroneous; and that certain of the court's conclusions, which may be traceable to the absence of relevant case law in this jurisdiction, rest on a misconception of applicable legal principles. We vacate the trial court's findings and conclusions pertaining to the undue influence and intentional interference with an expected inheritance counts of Barbara J. Ingersoll's complaint (Counts I and III), reverse its judgments regarding Counts I and III, and remand this case with instructions to enter judgment for appellants on Counts I and III of the complaint.

In addition, we reverse the trial court's apparent ruling that William had no standing to bring the conversion count of the counterclaim, but we remand this case to the trial court to determine the retroactive impact, if any, of the Uniform Nonprobate Transfers on Death Act on Count IV of William B. Ingersoll's counterclaim (the conversion count). However, we sustain the trial court's judgment concerning Count I of the counterclaim pertaining to a residential property.

## FACTUAL SUMMARY

The record before us reveals that on March 14, 1999, Loraine Ingersoll, then an 88–year–old District of Columbia resident (whose husband, Dr. William Brown Ingersoll, died in 1977), entered Sibley Memorial Hospital where she later was diagnosed with pancreatic cancer. She underwent heart bypass surgery on March 27, 1999, due to congestive heart failure. On April 1, 1999, while she was still in the hospital, Mrs. Ingersoll executed five documents, including amendments to her trust and will, and signed a deed on April 6, 1999. She was discharged from the hospital on April 9, 1999, and she died on June 2, 2000.

After Mrs. Ingersoll's death, her four children, William Boley Ingersoll ("William"), Barbara Jane Ingersoll ("Barbara"), Henry Grant Ingersoll ("Henry"), and Joseph Warren Ingersoll ("Joseph"), became locked in an intense and unpleasant disagreement concerning their mother's testamentary intent and the distribution of her assets. The two main antagonists in this struggle were the children on whom Mrs. Ingersoll depended the most—Barbara, for her personal care as she aged and became ill, and William, her oldest son, for carrying out her wishes with respect to her estate.

In early 2001, Barbara filed a verified complaint against her brothers and the District of Columbia.[1] In Count I of her complaint, she alleged undue influence by William on her mother, thereby resulting in a restatement of the Loraine Boley Ingersoll Trust ("the Trust") and in William's control of twenty-five percent of her mother's estate, which he placed in the Ingersoll Family Foundation ("the Foundation"), a charitable foundation created after Mrs. Ingersoll's death.[2] In Count

---

1. The District of Columbia became involved in the litigation because some of Mrs. Ingersoll's trust assets were earmarked for a charitable foundation. "Unlike many jurisdictions, the District of Columbia does not have a statute specifically authorizing [it to intervene in actions such as this], but courts in this jurisdiction recognize the power of a public officer to [act] in a *parens patriae* capacity to enforce the public right to continuing application of charitable trust property to proper purposes." *Hooker v. Edes Home,* 579 A.2d 608, 612 n. 9 (D.C.1990).

2. Count II alleged breach of fiduciary duty, and pertained to $100,000 worth of jewelry which William allegedly removed from the

III ("Tortious Interference with an Expectancy"), Barbara asserted that William, as Trustee of the Trust, intentionally interfered with her receipt of real and personal property from her mother. She sought to invalidate (1) the restatement of the Trust as well as the creation of the Foundation, or William's control over the Foundation; and (2) William's judicial effort to evict her from the home on Dexter Street, in the Northwest quadrant of the District, in which she had resided with her mother.[3] Barbara demanded deeds to the Dexter Street property, as well as the contents of that property, and a beach home in Delaware, including its contents; in the alternative, Barbara requested a monetary sum equal to the value of the Dexter Street and Delaware properties and their contents.[4]

In late March 2001, the Ingersoll brothers lodged an answer, and a counterclaim against Barbara relating to the Dexter Street property. Their counterclaim alleged loss of fair rental value, common law waste, and interference with prospective business advantage. The counterclaim also contained a conversion count which maintained that Barbara wrongfully converted personalty, mutual funds and bank accounts from her mother's estate.

The struggle between William and Barbara intensified in April and May 2001. In response to William's efforts to gain entry to inspect the Dexter Street property in connection with his role as personal representative of Mrs. Ingersoll's estate, and William's landlord and tenant complaint for possession, Barbara filed for a protective order, and for a show cause order pertaining to personal property in the Delaware home. Following a May 2001 hearing, the trial court appointed a receiver for the Trust. However, after the filing of pleadings by the siblings to reverse the appointment, and a hearing on those pleadings in September and October 2001, the trial court vacated its receivership order on November 1, 2001.

Subsequently, trial on Barbara's lawsuit began on June 17, 2002, but on that day the parties orally informed the trial judge that they had reached a settlement. On June 18, one of the parties stated that no agreement had been reached. Further delay in the trial occurred when one of the parties sought to enforce the purported settlement agreement, and hearings on the motion to enforce the purported agreement took place on four separate days in August, September and November 2002. Thereafter, when no settlement occurred, a new trial took place in late June and early July 2004, lasting nine days.[5]

residence in which she resided with her mother. This count is not at issue in these appeals.

3. On December 18, 2000, William Ingersoll filed a complaint for possession against his sister, Barbara, seeking to oust her from her residence on Dexter Street.

4. On February 28, 2001, Barbara filed a first verified amended complaint which added a count IV, seeking the removal of William as the Trustee of the Trust.

5. The trial revolved around several testamentary documents signed by Mrs. Ingersoll's husband, and by Mrs. Ingersoll. These documents include the Trust Agreement of April 15, 1977, and Mrs. Ingersoll's will of the same date; the November 17, 1989 will and revocable trust of Mrs. Ingersoll; the July 12, 1993 will codicil of Mrs. Ingersoll; the October 7, 1996 will codicil and restated revocable trust of Mrs. Ingersoll; the April 1, 1999 trust and will of Mrs. Ingersoll; and the April 6, 1999 deed to Mrs. Ingersoll's residential property. The 1996 trust provided for the transfer of remainder trust property to the William Brown Ingersoll and the Loraine Boley Ingersoll Foundation; and the 1999 trust called for the establishment of the Ingersoll Family Foundation, Inc. after Mrs. Ingersoll's death. By the April 6, 1999 deed document, Mrs. Ingersoll transferred title to her District residence to "William B. Ingersoll, Trustee of the Loraine Boley Ingersoll Trust."

Barbara, the plaintiff (appellee in this court), presented testimony from several witnesses. Some witnesses attempted to show that Mrs. Ingersoll intended that Barbara should get the Dexter Street and Delaware properties and their contents, and that Mrs. Ingersoll did not intend to create a charitable foundation. Francis Kane, who grew up in the same area of the District as the Ingersoll family, and who had a beach home in the same Delaware area as the Ingersoll family, spent time with Mrs. Ingersoll in July 1997 when he drove her from the Delaware beach to her Dexter Street home. During a conversation which Mrs. Ingersoll wanted "to be in trust," Mrs. Ingersoll said that the contents of the Dexter Street home, as well as the Dexter Street property and the Delaware property, were to go to Barbara "tax free" for her life, and then to all the grandchildren. Except for Mrs. Ingersoll's "charitable gift" to her college, the Ingersoll siblings should each receive one-quarter of her remaining estate. The word "foundation" never came up in any of Mr. Kane's conversations with Mrs. Ingersoll. On cross-examination, Mr. Kane acknowledged that his friendship with Barbara was "substantially closer" than that with her brothers. Around 1998, Barbara took her mother to an appointment with Barbara Deraad, Mrs. Ingersoll's hair stylist. According to Ms. Deraad, Mrs. Ingersoll said, "I want Barbara to have my home and everything in it." "The boys have their own homes." When Barbara Ingersoll visited Ms. Deraad in 2001, she was upset about the Delaware beach home that she could not buy.

Lawrence Gaffey, an accountant whose firm was retained to do accounting work for the Ingersoll family, had a telephone conversation with Mrs. Ingersoll around May 1996, but he did not recall the content of their conversation or any mention of a family foundation. Mr. Gaffey worked with a partner in his firm, Jon Deane, and Mr. Gaffey had limited involvement in estate planning for Mrs. Ingersoll. He had previously worked with Mr. Nudelman, "an excellent estate attorney." Mr. Gaffey, not William Ingersoll, recommended that the firm bring in Mr. Nudelman to work on Mrs. Ingersoll's estate planning.

Through testimony from attorneys and accountants, Barbara endeavored to establish that William determined Mrs. Ingersoll's testamentary intent, and hence, unduly influenced her. One of the attorneys who testified was Ronald Recht. William referred his mother to Mr. Recht, a "tax-oriented estates and trusts" attorney. Mrs. Ingersoll retained Mr. Recht around 1987. Mr. Recht recalled talking with Mrs. Ingersoll about "preserving her estate for the children, grandchildren, and possibly making a charitable contribution." Mrs. Ingersoll stated that Mr. Recht "should deal with Mr. [William] Ingersoll in working out the details." Mr. Recht discussed the work he performed on behalf of Mrs. Ingersoll until sometime in 1995, as well as his interactions or communications with Mrs. Ingersoll, William, Henry and Joseph, and Jon Deane, a partner in the family's accounting firm. Mr. Recht sent a memorandum on June 5, 1989 to the Ingersoll brothers and Jon Deane "discussing a possible charitable leave trust." However, he was never asked to prepare any documents relating to his memorandum. Mr. Recht believed that William asked him to make a change in the 1989 trust documents; instead of an outright distribution to him, the trust amendment would reflect a trust distribution. Mr. Recht had no notes and remembered no communication with Mrs. Ingersoll about the 1993 amendments and did not think he sent them to her. His May 3, 1993 letter to William, conveying the trust amendment and codicil to Mrs. Ingersoll's will, was not

sent to Mrs. Ingersoll. On May 7, 1993, he also sent the amendments to Jay Zawatsky at William's law firm, Ingersoll and Block. Although Mr. Recht's notes showed, "375,-000" and "CLT" (charitable leave trust), he was never asked to create a CLT and recalled no conversation with Mrs. Ingersoll regarding "how to effectuate her charitable intent."

On February 1, 1995, Mr. Recht sent a letter to William concerning Mrs. Ingersoll's federal estate tax estimate. The letter also contained a "summary of [Mrs. Ingersoll's] present estate plan, possible use of the charitable leave trust, possibl[e] use of a family partnership, [and] the possibility of a personal residence trust." Mrs. Ingersoll sent Mr. Recht, by certified mail, a handwritten note dated February 20, 1995 bearing an "indurata notary" and "a raised seal." The letter, purporting to amend her will, specified that the Dexter Street home and the beach home in Delaware would go to Barbara and Joseph. On February 23, 1995, Mr. Recht advised Mrs. Ingersoll, by letter, that she would need to "formally" amend her trust or will, and suggested a meeting with "the children or the family" "if she want[ed] to go forward with these changes." Sometime after receiving Mrs. Ingersoll's February 20th letter, Mr. Recht met with her and William. On July 21, 1995, Mr. Recht sent a letter to William referencing a meeting with Mrs. Ingersoll and William "on Thursday of last week" and the "conclusions that we reached." Paragraph 4 of the letter states:

> *Barbara's Right to Purchase Both Residences and Their Furnishings.* Barbara is to have the right to purchase both residences and their furnishings at a price equal to their values as finally determined for federal estate tax purposes. We did not discuss how that value would be determined if the residences are transferred to personal residence trusts and are not revalued later for federal estate tax purposes. In that event, presumably, the basis for valuing the residences for gift tax purposes would be used on an updated basis.

Mr. Recht met together with Mrs. Ingersoll, William and Barbara, but did not mention the date of the meeting. Mr. Recht did not believe that he was ever asked to prepare documents for Mrs. Ingersoll's signature which would reflect the conclusions mentioned in his July 21st letter. Later, on October 4, 1996, he faxed a copy of Mrs. Ingersoll's will and first codicil to Mr. Gaffey, but did not recall who requested the documents. On cross-examination, Mr. Recht asserted that in 1989 he may have discussed a charitable gift with Mrs. Ingersoll. He recalled that Mrs. Ingersoll "wanted to make what we would consider substantial charitable gifts," and he acknowledged that a charitable gift in excess of one million dollars "comes to mind." In addition, he remembered that Mrs. Ingersoll wanted her children to share the rest of the money equally.

The task of preparing trust amendments shifted to Barry Nudelman, an estate attorney, in October 1996. Mr. Nudelman testified that he had never met Mrs. Ingersoll, nor spoken with her by telephone. On October 1, 1996, Mr. Gaffey asked him to lunch and requested that he perform estate planning services for Mrs. Ingersoll. Notes that Mr. Nudelman took during the luncheon meeting show that Mrs. Ingersoll was 87–years–old at the time and that his work would concern a trust amendment for her. The amendment would divide the trust estate into two components at Mrs. Ingersoll's death—(a) the beach home and the Dexter Street property, and (b) all other assets. "All other assets other than the residence [were] to be created into [a] foundation known as the William Brown Ingersoll and Loraine Boley Ingersoll

Foundation." If the foundation was not created during Mrs. Ingersoll's lifetime, it would be "set up by William B. Ingersoll [son] and one of the [trustees]." Mr. Nudelman's notes also say: "Son wants to be foundation manager and derive a fee (foundation will be funded at ten million dollar level)." The notes continued: "Family entity already exists and may be used to hold real estate or [otherwise], new entity will be created, and it is likely that interest in the new entity would be transferred to [private foundation]"; and "[s]on would get income from entity." Mr. Nudelman transmitted draft and final draft trust amendments and second codicil to Mr. Gaffey in early October 1996. He had no conversations with Mrs. Ingersoll after transmitting these documents and did not meet with William, but had a telephone conversation with him on October 17, 1996. Mrs. Ingersoll never responded to the "personal and confidential" engagement letter which Mr. Nudelman sent her on November 1, 1996. He could not explain why he addressed the letter to Mrs. Ingersoll at a Virginia address when she lived in the District.

More estate work was done for Mrs. Ingersoll in 1998 and 1999. Patrick Vaughn, a trust and estates attorney for 34 years at the time of trial, had a meeting with William on November 17, 1998. Mr. Vaughn had never done work previously for William or the Ingersoll family. He stated at trial that he did not know who referred William to him. William wanted estate planning done for his mother; he handed Mr. Vaughn the 1989, 1993, and 1996 trust documents. After reviewing them, Mr. Vaughn "recommended that the provisions for the foundation be expressed as a percentage and as a specific bequest with a residuary trust assets to go to the non-charitable beneficiaries." A second meeting took place on November 23, 1998, with Mr. Vaughn, William, and Mr. Deane,

the partner at the family's accounting firm. They "discussed a number of [ ] estate tax reduction strategies." Subsequently, Mr. Vaughn had several telephone conversations with William in December 1998 and March 1999. William did not inform Mr. Vaughn in March that his mother was in Sibley Hospital. As instructed by William, Mr. Vaughn assembled the documents he prepared, together with a March 23, 1999, cover letter addressed to Mrs. Ingersoll, care of William. He believed that William picked the package up on March 31 because he had an appointment to see someone else at Mr. Vaughn's firm on that date. On cross-examination, Mr. Vaughn stated that it was not unusual for a client to sign documents in the hospital.

Jon Deane, a CPA, performed work for Mrs. Ingersoll "from 1978 through her death." He described her as "financially astute as to the details of her financial planning," but stated that she was not as astute in her later years as her earlier years. He never spoke with Mrs. Ingersoll about estate planning. Mr. Deane identified 1996 notes from a telephone conversation he had with William and Mr. Gaffey. His notes included the words, "BJI to get homes," which were written "during the discussion of how [Mrs. Ingersoll's] estate was to be handled . . . ." On cross-examination, Mr. Deane acknowledged having discussions with William and Mr. Gaffey concerning Barbara paying for the Dexter Street and Delaware properties, and regarding Barbara's 25% of Mrs. Ingersoll's estate consisting of the two properties, or the two properties "com[ing] out of [Barbara's] 25%" of Mrs. Ingersoll's estate.

Barbara's testimony focused on the Dexter Street and Delaware beach homes, her mother's health, and the family foundation. She recounted occasions on which her mother orally stated that she, Barbara,

would get these two properties, including a December 1999 meeting with Dr. Kaplan, Barbara's therapist and psychological consultant. Present at the meeting were Mrs. Ingersoll, William, Barbara, and Dr. Kaplan. Mrs. Ingersoll "wanted a witness to hear what she had to say about [her] trust, and what she wanted in the trust...." Mrs. Ingersoll said that Barbara "was to get that house on Dexter Street, free and clear ... and the contents of it[,] and she wanted [Barbara] to get the beach house during [Barbara's] lifetime, ... and the grandchildren [thereafter] so it would stay in the family." William responded, "Fine, mother, if that's what you want."[6] In addition to oral statements about her mother's wishes with respect to the Dexter Street and Delaware homes, Barbara referenced notes and letters written by Mrs. Ingersoll concerning the two properties.[7]

Barbara's testimony also detailed Mrs. Ingersoll's illness and hospitalization in March 1999. In addition to the diagnosis of pancreatic cancer, Mrs. Ingersoll was suffering from congestive heart failure.[8] She had two operations in March 1999, bypass surgery and another procedure relating to that surgery. Mrs. Ingersoll "was feeling a lot better after the second surgery." On April 1, 1999, the day Mrs. Ingersoll signed documents pertaining to her estate, Barbara was not at the hospital. William's wife "had asked [her] to go look at nursing care" facilities for Mrs. Ingersoll.

Barbara first learned about the contents of her mother's will and trust when she received a letter dated July 11, 2000 from Attorney Rhonda J. MacDonald who was handling the settlement of Mrs. Ingersoll's will and trust. Barbara was "shocked about the foundation ... and [the fact] that 25% of [her] mother's estate was to go to a foundation and that [Barbara's] brother [William] was going to be in control over 25 percent of this money, and [her] immediate feeling was [William] was going to give this to the Mormon Church...." Mrs. Ingersoll never told Barbara that she would create a foundation. On August 2, 2000, Barbara found her mother's November 10, 1999 note, which specified that the Dexter Avenue house and its contents should go to Barbara.

On cross-examination, Barbara read an excerpt from Mrs. Ingersoll's July 15, 1989 note, see note 7, *supra*, which states: "I would like to have one of my children buy

---

**6.** According to Barbara, Mrs. Ingersoll stated in Summer 1995, that she wanted Barbara to have the Delaware property for her lifetime, and then it was to go to the grandchildren so that it would stay in the family. In 1996, Mrs. Ingersoll told Joe Deraad, whom Barbara described as "a handyman, service man, for [the Dexter Street property] and [her, Barbara's] friend," that "she wanted [Barbara] to have the [Dexter Street] house ... and everything in it." Around 1997, while Mrs. Ingersoll, Barbara, and Beatrice Schwartzman (a life-long friend of Mrs. Ingersoll) were at the country club, Mrs. Ingersoll declared that she was leaving the Dexter Street house and everything in it to Barbara.

**7.** Some time after August 2, 2000, Barbara came across her mother's July 15, 1989, note which left her estate to her four children

"equally," and which stated that the Delaware property should be "enjoy[ed]" by her "children and grandchildren," and if a decision was made to sell the property, then Barbara should "have what furniture she needs to furnish another house." On March 2, 1995, Mrs. Ingersoll wrote a note to Barbara which she later gave to her in an envelope to be opened after Mrs. Ingersoll's death. The envelope contained Mrs. Ingersoll's handwritten note of February 20, 1995, leaving her Dexter Street and Delaware homes to Barbara and Joseph.

**8.** A March 21, 1999, Sibley Memorial Hospital Consultation report from Dr. Michael L. Palmer revealed that Mrs. Ingersoll's past medical record "[i]ncludes a history of congestive heart failure six years ago."

out my house in DC [ ] Dexter St N.W." Barbara acknowledged writing a letter to Attorney MacDonald, dated July 25, 2000, expressing her intent to purchase the Dexter Street and Delaware properties, but asserted that she wrote the letter before finding her mother's note of November 10, 1999, on August 2, 2000.

The Ingersoll brothers presented several witnesses in their defense. William, the oldest son and an attorney, detailed his efforts to assist his father and mother in working out their testamentary documents and trusts. He recalled that in 1977, his father was ill with cancer and asked him to find an attorney to prepare testamentary documents for the father and mother. On April 15, 1977, Mr. Ingersoll and Mrs. Ingersoll executed trust (marital trust and testamentary trust) and will documents. William and Henry were co-trustees for their parents' estate. Henry left the Metropolitan Washington area in 1986 and became less involved in the management of the estate.

Around 1988, Mrs. Ingersoll informed William that "she wanted to meet with an estate attorney to update her will and documents." Mr. Recht's law firm was in the same building as that of William, and William sought his assistance. Mr. Recht prepared the 1989 documents, and William discussed them with his mother before and after she signed the documents. Sometime after signing the 1989 documents, Mrs. Ingersoll voiced her desire "to do something to create in her will or trust contributions to several different organizations." She mentioned Utah State University from which she graduated, and Brigham Young University which William's father attended, and Georgetown Dental School. Mrs. Ingersoll signed newly prepared documents in July 1993, including her revocable trust.

At Mrs. Ingersoll's request, she, William, and Barbara met with Mr. Recht on July 13, 1995, because Mrs. Ingersoll had received information from Mr. Recht and Mr. Dean "regarding her estate and the need for more planning in her estate." When Barbara asked for clarification concerning her right to purchase the Dexter Street and Delaware properties, William responded that "it had always been" the position of the brothers and Mrs. Ingersoll that Barbara "would be given a first right to purchase the properties after [Mrs. Ingersoll's] death . . . ." Mrs. Ingersoll and Barbara agreed with William's statement. At the same July 13th meeting, Mrs. Ingersoll "said she wanted to provide a substantial part of her estate to charity." Mr. Recht indicated that he would prepare a letter outlining implementation details for the charitable giving. When William received Mr. Recht's letter of July 21, 1995, proposing ways to handle Mrs. Ingersoll's real estate assets, her charitable giving, and Barbara's right to purchase the Dexter Street and Delaware residences, William discussed the matter with his mother. She felt that Mr. Recht's approach "was too complicated" and that "he was doing things that she felt were really not what she wanted to do" because "she didn't want to lose control" over her assets. Mrs. Ingersoll "wanted to find a way to create some charitable giving," but "[s]he basically wanted to do it on a testamentary basis that would be formulated at the time of her death, that would go into effect at the time of her death." Furthermore, she did not want Barbara "to be obligated to buy the property," but she wanted Barbara to have "a first right of refusal to buy those properties" or the right to purchase those properties.

William testified about a charitable giving discussion his mother had, in his presence, on September 8, 1996, at the home of Seth Horne, William's father's "lifetime

business partner," who was married to one of Mrs. Ingersoll's distant cousins. Mrs. Ingersoll told Mr. Horne that "she wanted to give money to charity but that she could not figure out a way to do it so that it could be done ... after her death." Mr. Horne "explained to her that he had established a charitable foundation," and "[h]e went into a fair amount of detail." Mrs. Ingersoll "said she would like to do that." On the return drive to her home, Mrs. Ingersoll repeated that she wanted to create the foundation and instructed William "to get it done." William contacted Jon Deane, a partner in the accounting firm that the family used, because his mother wanted someone new. Mr. Deane had a partner, Mr. Gaffey, who "had somebody that he worked very closely with and [who] was very familiar with setting up foundations and would be able to do the work." Mr. Gaffey recommended Mr. Nudelman whom William had never met. William worked through Mr. Gaffey and never met with Mr. Nudelman. William informed his mother that "the accountants and the attorney needed to know what assets would be going into the foundation." Mrs. Ingersoll "said that she would go through the assets and pick out assets, which she did with his assistance. And, the October 1996 Trust referenced the William Brown Ingersoll and Loraine Boley Ingersoll Foundation. Attached to plaintiff's exhibit 18 and defendants' exhibit 10 of the October 7, 1996 trust amendment signed by Mrs. Ingersoll is Exhibit A, which reads: "WILLIAM BROWN INGERSOLL and LORAINE BOLEY INGERSOLL FOUNDATION. Objects and Purposes." [9] Attached to plaintiff's exhibit 69 of the October 7, 1996 trust amendment also is Exhibit A which states:

WILLIAM BROWN INGERSOLL AND LORAINE BOLEY INGERSOLL FOUNDATION

Objects and Purposes:

To contribute funds for educational, religious (The Church of Jesus Christ of Latter-day Saints), and humanitarian purposes.

William maintained that he had not seen Exhibit A of the plaintiff's exhibit 69 before the instant litigation. He explained that Mrs. Ingersoll went to his office to execute the 1996 documents which Mr. Nudelman had prepared. She asked William whether "those were the documents that created the foundation." William said, "yes," and went through the documents with his mother. William offered an explanation of why Exhibit A of the 1996 amended trust was not completed on plaintiff's exhibit 18 and defendants' exhibit 10, but was filled in on plaintiff's exhibit 69. Mrs. Ingersoll executed the documents at William's office, but said that she wanted to be specific about Exhibit A, and that she would fill it in herself. Mrs. Ingersoll's signature appears in the margin of both versions of Exhibit A, with the date of execution, October 7, 1996.

In the years after her execution of the 1996 documents, Mrs. Ingersoll's "health began to deteriorate." Around 1998, William testified, his mother "indicated that she wanted to be absolutely sure that the estate documents were in updated condition under current law and that they contained everything that she wanted to be done with her estate." Mrs. Ingersoll mentioned a desire to see John Y. Merrell, a longtime personal friend and a lawyer. William took his mother to a meeting with Mr. Merrell. Mr. Merrell suggested that they consult with an associate in his firm

---

**9.** No objects and purposes were filled in on plaintiff's Exhibit 18 and defendants' exhibit 10 of the October 1996 Exhibit A.

who performed estate work. During a meeting with the associate, Mr. Fergerson, Mrs. Ingersoll expressed "certain concerns regarding the existing foundation," and hence, she "wanted to have her estate documents looked at by another attorney, and reviewed by another attorney, and updated," because "assets ... [previously designated by Mr. Nudelman] had changed." Mr. Fergerson recommended that they consult with Patrick Vaughn who practiced at another firm. William did not know Mr. Vaughn, but while he was still in Mr. Fergerson's office, called and scheduled a meeting with him on the following day, November 17, 1998. Mrs. Ingersoll met with Mr. Vaughn on November 17, and subsequently, William had discussions with him several times, either with Mr. Deane, or by himself.

Mr. Vaughn and his firm prepared draft documents which were sent to William in January 1999. "[W]ithin a few days [after] receiving [the draft] documents," William met with his mother at his office "probably more than an hour," reviewed and explained the documents to her. She "was interested mainly in ... the allocation of assets into the foundation, which assets would go into the foundation." Mrs. Ingersoll "wanted to review [the documents] herself," and took copies with her. Three weeks later, William again met with his mother and she posed questions about the grandchildren's trust. Mrs. Ingersoll did not sign the documents on that occasion, but at the end of February 1999, she called William "and said she wanted to execute the documents." William then asked Mr. Vaughn to put the documents in final form. William was delayed in picking up the final version of the documents because of his mother's illness and hospitalization. He picked up the documents from Mr. Vaughn's office "a day or so after [his mother's] operation," not on the 31st of March. On March 31, 1999, when William visited his mother at the hospital, she voiced a desire to sign the documents and asked William to arrange for the signing at the hospital.

William contacted his office to obtain witnesses for the signing. In addition, he called the head nurse at the hospital to alert her and to inquire whether there would be any problem with his mother signing documents; the nurse articulated no objection. On April 1, 1999, William went to his mother's hospital room. She "appeared to be very awake and normal," and "the bed was propped up like she was sitting up so she could look at things."[10] William informed his mother that witnesses to the document signing were outside and asked "if she felt okay, whether she felt she could sign the documents" and desired to do so. Mrs. Ingersoll gave an affirmative answer. William placed the documents (trust, will, power of attorney, advanced medical directive, and assignment of personal property) on the hospital table in front of Mrs. Ingersoll. She "asked [ ] if those [were] the documents that she had reviewed before." William responded that the date and notary had been changed; otherwise "they were exactly the same as the documents she had reviewed." William then summoned the witnesses and the notary, and introduced them to his mother. William again asked his mother preliminary questions concerning how she felt, her readiness to sign the documents, and her knowledge of what she would be signing. After Mrs. Ingersoll's responses revealed that she was prepared

10. Hospital records for early afternoon on April 1, 1999, indicate that Mrs. Ingersoll had normal skin color, was "[a]lert and oriented X 3," had a regular heart rhythm and clear lungs, and her vital signs were "stable." The record noted that Mrs. Ingersoll's speech was "broken at times," but that she was "able to communicate needs to staff."

to proceed with the signing, William read the headings of each document, briefly explained them and for each of the documents, Mrs. Ingersoll asked, "is this the same document I had reviewed before"; and William responded, "yes." Mrs. Ingersoll executed each document, and placed her initials on each page. Then, the witnesses and the notary affixed their signatures to the appropriate documents.

Jay Zawatsky, Robert Pugh, and Laurie Size, the persons who were in the hospital room on April 1, 1999, when Mrs. Ingersoll executed the documents, testified for the defense. Mr. Zawatsky, self-described as a "[v]ery good friend" and associate of William, stated that William had asked him to witness the documents, and that he had arranged for Mr. Pugh and Ms. Size to accompany him to the hospital. When he entered Mrs. Ingersoll's room, he asked if she remembered him and she replied, "Of course. [ ] You're that nice man Jay Zawatsky who helped me with my gift deed." He answered, "That's right." Mr. Zawatsky "sat down on [the edge of Mrs. Ingersoll's] bed with [his] feet on the floor, and turned [his] body ..." to talk with Mrs. Ingersoll. After briefly talking about food, Mr. Zawatsky posed a question to Mrs. Ingersoll: "Do you know why we're here today?" She responded, "Ye[s]. You're here to help me with my documents." To Mr. Zawatsky's question, "Have you read these [documents]," Mrs. Ingersoll declared, "I know what's in them." Mr. Zawatsky got up from the bed and William sat down "and they started to go through the documents." Mr. Zawatsky described Mrs. Ingersoll as "buoyant." He watched William "page [ ] through the documents" with his mother. Mrs. Ingersoll wrote "slowly" but "without anybody assisting her." Mr. Zawatsky witnessed the documents, and he identified them at trial.

Robert Pugh, an accountant who had known William for twenty-one years, also witnessed the documents Mrs. Ingersoll signed on April 1, 1999. He testified that Mrs. Ingersoll "seemed very alert, cognizant of ... what we were doing and what she was doing." Laurie Size, the office administrator at William's firm for twenty years and a notary, had worked with Mr. Pugh and later assumed her post under William. She stated that on April 1, Mrs. Ingersoll "seemed very alert and she was talking."

On April 6, 1999, William called his mother at the hospital to tell her that he had another document for her signature, the deed to the Dexter Street property. Mrs. Ingersoll said she felt well enough to sign the document, but "asked [William] whether it was really necessary, because she had given [him] authority to sign documents in the Power of Attorney." At the hospital, Mrs. Ingersoll wanted to know where the deed to the Dexter Street house "was going," and William responded that signing the document "would put the title to her property in her trust," and that "she was a trustee under the trust, and she could re-execute documents." Mrs. Ingersoll signed the deed and it was notarized by Laurie Size.[11] Laurie Size stated that she returned a second time to the hospital to witness Mrs. Ingersoll's signature on a deed document. As on the previous occasion, she had no reason to believe that Mrs. Ingersoll could not see, hear or understand what was happening. Later, William discovered that no witness had signed on the witness line, called an attor-

11. Although there does not appear to be any detailed patient chart summary for April 6, 1999, as there was for April 1, 1999, the one entry on the hospital "Progress Record" for April 6th contains nothing to suggest that Mrs. Ingersoll was experiencing any cognitive problems or medical episodes on that day.

ney at a title company and received advice. The witness line was filled in by Mr. Pugh. Mr. Pugh testified that he witnessed the document on April 6, at William's request, after hearing William's explanation of why he, Mr. Pugh, was being asked to sign a deed document in his office, as a witness, and upon learning what the settlement attorney had advised William in light of the fact that Mrs. Ingersoll had already signed the document at the hospital and was not present, Mr. Pugh witnessed the deed.

Mrs. Ingersoll left the hospital on April 9th, and entered a nursing facility. After returning home from that facility, William testified that she called him "to request a meeting with the broker [who] was handling all the assets of the trust." William arranged for a meeting with the broker the first week of December 1999. Mrs. Ingersoll had copies of all the documents she had signed at the hospital during her meeting and discussions with the broker.

Also, in the first week of December, William recalled meeting with Mrs. Ingersoll, Barbara, and Dr. Kaplan. Barbara "wanted a clarification of her right to buy [the] Dexter Street [property]." William "said that it had always been the understanding that [Barbara] would be given the first right to purchase [that property] at the fair market value minus" the brokerage fee, if no broker was used. William asserted that his statement of what had always been the understanding "would have to be approved by [Henry and Joseph]."

On December 31, 1999, Mrs. Ingersoll was admitted to Georgetown Hospital where she remained for one month before being sent to a nursing facility. In May 2000, William had several discussions with his mother. "[S]he was very interested in the foundation. She indicated some things she wanted the foundation to do." She manifested a desire to make a contribution to the Barlow Center, an educational facility in the District, and she told William that she had spoken with the Marriott family about a contribution to a Marriott Charter School. William agreed to "work that out," and eventually, after Mrs. Ingersoll's death, the foundation sent a check in the amount of $100,000 to the Marriott Hospitality Charter School.

In addition to William, Henry and Joseph gave testimony for the defense, concerning the Dexter Street and Delaware properties, and the charitable foundation. Henry, a registered architect and commercial developer, was responsible for paying the bills for the Dexter Street and Delaware properties before he moved to California in 1986. He paid these bills from funds in his mother's personal account or the marital trust. The last conversation he had with his mother about these two properties was in New Hampshire in Summer 1999 when Mrs. Ingersoll stayed with him for a period of time. She wanted her assets to be "divided equally amongst the four brothers and sister," but also stated "she would like Barbara's interest to be that of her two house properties, namely Dexter Street and Rehoboth, Delaware." His mother did not say that Barbara should get the properties without having to pay for them.[12]

On cross-examination, Henry acknowledged that he complained to William after, but not before his mother's death, about

---

12. Henry stayed at the Dexter Street property in 1999 when his mother was in the hospital. According to him, "[t]he house was in disarray." Papers were located throughout the house, and boxes were "piled up in the kitchen, clothing ... different rooms, not put away. It was highly disorganized." He described Barbara as "very domineering and controlling," and "very intolerant of [his] mother's wishes."

his lack of involvement in Mrs. Ingersoll's trust and testamentary documents. He was not in the District when Mrs. Ingersoll signed documents on April 1, 1999. He did not learn about the foundation until after his mother's death, and was concerned that it would diminish his share of the estate. During his New Hampshire conversation with his mother in Summer 1999, she said nothing about creating a foundation, but she did mention charitable giving.

Joseph Ingersoll, a commercial leasing specialist and businessman, took over responsibility for management of bills relating to the Dexter Street and Delaware properties following Henry's move to California. He paid these bills from Mrs. Ingersoll's personal checking account or from her marital trust account. He also paid bills for Barbara's Bethesda, Maryland house from Barbara's account. Prior to being taken into the operating room in March 1999, Mrs. Ingersoll told Joseph that she was "working out documents with [William] for [her] will." He told her not to worry about it then, just worry about her health. On cross-examination, Joseph said his mother did not mention a foundation in her hospital comment to him. He acknowledged making a statement during his earlier deposition that when he drove his mother to his Virginia home in May 2000, about two weeks before her death, "she said, well, I hope you can be nice to your sister and accept her the way she is, and I hope that someone will keep the Delaware property in the family." In the same deposition he asserted "that [he] heard about a year before [his] mother died that Barbara wanted the Dexter Street house."

Rhonda Macdonald, an attorney specializing in tax, estates, and trusts, and a CPA, was called as a defense witness to discuss her role in drafting papers for the Ingersoll Family Foundation, and her role as attorney to William in his capacity as Personal Representative of his mother's estate and as Trustee of the Trust. After meeting her at a seminar where Ms. Macdonald spoke on the subject of estate tax, William retained her in June with respect to his role as personal representative and trustee of his mother's estate and trust, and his father's marital trust. On July 11, 2000, Ms. Macdonald sent a letter to the Ingersoll siblings discussing aspects of the estate and trust. One paragraph of the letter focused on the Ingersoll Foundation, as provided for in the 1999 Trust. Ms. Macdonald testified that in July 2000, she "prepared the [document for the] Ingersoll Family Foundation[,] sent it to [William] for his review, and ... filed [it] with the IRS in early August."

Ms. Macdonald's original draft document creating the Ingersoll Family Foundation contained a provision for trustee compensation, which she usually included in such documents. However, William called and instructed her to eliminate compensation for the trustee. Consequently, Article VIII(G) of the August 7, 2000 document, signed by William and submitted to the IRS, specified: "No Trustee shall be entitled to compensation for services in administering this Trust, but upon majority vote of the then-serving Board of Trustees, a Trustee may be reimbursed for reasonable expenses incurred in connection with the administration of this Trust."

Ms. Macdonald's letter advised the Ingersoll siblings that based upon a preliminary estimated value of their mother's estate and trust at $14 million dollars, and a 25% charitable deduction of $3,500,000 with respect to funds to be distributed to the Ingersoll Family Foundation, and other appropriate deductions, the estimated estate tax would be approximately $5,100,000; and that there would be a

$1,300,000 estimated distribution to each of the four children (not including a $1,000,000 life insurance policy which the siblings already had shared equally). Related to the $1.3 million estimated distribution to the siblings was the question of the Dexter Street and Delaware properties. Ms. Macdonald's letter stated her understanding (gained from William) that Barbara "may want to purchase these properties." Since "the appraised value of these properties may exceed [Barbara's] estimated $1,300,000 share" of the estate, William, the executor and trustee, could distribute them to her "as long as she arranges to pay the difference between the appraised values of the properties and the final amount of her 1/4 share." Nevertheless, both Henry and William should approve the distribution of the properties to Barbara since she is "a related party" rather than "a stranger" or open market purchaser.[13]

In addition to testimony from their witnesses, the parties introduced into evidence or referred to numerous exhibits—137 for Barbara Ingersoll, and 69 for the Ingersoll brothers (not including plaintiff's exhibits that already had been admitted and which were used by the brothers). The trial court issued findings and conclusions in excess of 115 pages on December 9, 2004, and entered judgment on February 25, 2005. With respect to the relationship between Mrs. Ingersoll and her oldest son, William, the trial court stated:

> It is clear that Mrs. Ingersoll relied extensively, if not exclusively, on William to advise her and carry out her intentions and instructions with respect to the disposition and distribution of her assets, both before her death and after her death. Mrs. Ingersoll entrusted to William, the choice of the instruments, and the language to carry out her intentions and instructions as to the disposition and distribution of her assets, both before and after her death. Mrs. Ingersoll even left to William, the choice of the draft persons of instruments and language to effectuate her intentions and instructions as to the disposition and distribution of her assets.

The trial court further characterized the relationship between William and his mother:

> William has been an attorney for many years and Mrs. Ingersoll depended on him for legal advice for many years and William had a close fiduciary and confidential relationship with Mrs. Ingersoll for many years prior to her death.

But, "William improperly and without authority and through abuse of his confidential relationship to Mrs. Ingersoll through intimidation and concealment subdued the will of Mrs. Ingersoll and therefor, substi-

---

**13.** During her testimony, Ms. Macdonald expounded on efforts to appraise the Dexter Street property; Barbara's July 25, 2000, letter of intent to purchase the Dexter Street and Delaware properties; the $1.8 million appraised value of Dexter Street and the $1.7 million purchase price offered to Barbara; the $1.4 million purchase price requested for the Delaware beach house; communications between Ms. Macdonald and Barbara's attorney (Susan Pollack) concerning these properties as well as a Florida property; the decision to rescind the offer to Barbara to purchase the Dexter Street and Delaware properties; the Bank of America joint account between Barbara and her mother; and the Putnam mutual fund. Cross-examination of Ms. Macdonald centered on the August 2001 estate tax return for Mrs. Ingersoll, which showed a gross estate in excess of $16 million, a $1.25 million value of the Dexter Street property at the time of Mrs. Ingersoll's death, and a charitable gift to the Ingersoll Family Foundation of approximately $4.2 million; the IRS audit of the estate tax return which resulted, in part, in adjustment of the value of Dexter Street to $1.575 million and the Delaware property to $1.5 million; and the ownership of the Florida property.

tuted his own will to the extent of including" foundation provisions in the October 1996 and April 1, 1999 trust documents. The court also declared:

> [I]t has been established by clear and convincing evidence that Mrs. Ingersoll gave William no instruction to create the Ingersoll Family Foundation, because she would never have preferred one child above all of her other children, so as to give to one the sole power of disposition over 25% of her estate. To do so would violate her life long intent to treat her children equally, the one exception being that she intended that Barbara would receive her Dexter Street home for a "homeage to Brown and [her]self." To the extent that Mrs. Ingersoll signed documents on April 1 and 6, 1999, that created the Foundation and did not give Dexter Street and its contents to Barbara, the Court finds that it has been established by clear and convincing evidence that she did so by virtue of the undue influence and pressure placed upon her by William, in having the documents drafted according to his will and judgment and the circumstances of presenting these documents to Mrs. Ingersoll in her hospital bed when she was weakened [ ] physically and mentally, in a room full of William's associates, one of whom sat on her bed and when Barbara was out with William's wife. It has been established by clear and convincing evidence that at the time such documents were signed by Mrs. Ingersoll the undue influence and pressure placed on her by William had destroyed her agency and free will, and to that extent the will of William was substituted for the agency and free will of Mrs. Ingersoll.

Specifically, undue influence began in July 1995, when William began to isolate his mother from contact with her then attorney, Mr. Recht, and continued into 1996 and 1999, when she did not have independent contact with any other counsel:

> In July 1995, William cut off and prevented any further contact between Mrs. Ingersoll and her attorney, Mr. Recht. Indeed, subsequent to July 1995, William did not facilitate any contact between Mrs. Ingersoll and any attorney, except himself and his associate, Mr. Jay Zawatsky. William limited the contact and communications with the attorneys that were drafting instruments for Mrs. Ingersoll through himself. No memorandum or written record was made of any advice given by William to Mrs. Ingersoll regarding even the general contents of any of her instruments subsequent to July 1995, or of the opportunity to meet with the attorneys who purported to represent her in drafting the instruments. During Mr. Nudelman's and Mr. Vaughn's preparation of Mrs. Ingersoll's instruments, she was not disabled or unable to meet with each of them and express to each of them for herself her intent. William retained those attorneys to draft instruments for Mrs. Ingersoll and not to arrange a conference for Mrs. Ingersoll to express to the drafter's her intent was to preserve to William absolute control over Mrs. Ingersoll as to the contents of the 1996 and 1999 Trusts. William adopted a course of conduct, which destroyed Mrs. Ingersoll's agency and free will and thereby substituted his own will for the will of Mrs. Ingersoll. This course of conduct constituted undue influence, which brought about the inclusion in both Trusts of their respective provisions relating to the Foundation and the exclusion from the April 1, 1999 Trust of provision for the transfer of the Dexter Street, N.W. property and its contents directly to [Barbara], in addition to receiving a one-fourth interest in the re-

mainder of the April 1, 1999 Trust property. *See Himmelfarb v. Greenspoon,* 411 A.2d 979 (D.C.1980).

The conduct that appeared to have disturbed the trial court most with respect to William's alleged undue influence over his mother was the hospital room scene when William brought in the 1999 documents for Mrs. Ingersoll's signature. First, the trial court focused on Mr. Zawatsky's behavior when he entered the room:

Mr. Zawatsky had met Mrs. Ingersoll in 1990, but when he entered her room, she was lying in her hospital bed, which he proceeded to sit on with his feet on the floor. The Court finds this conduct in and of itself to have been inappropriate, demeaning and intimidating.

Next, the trial court criticized William's behavior as he took the documents to be signed from Mr. Zawatsky:

William then took the documents, Mr. Zawatsky got up from his seat on Mrs. Ingersoll's hospital bed, and William sat down on Mrs. Ingersoll's bed. The Court in like manner finds this conduct on the part of William to have been disrespectful, demeaning and intimidating; particularly since there was no one else in Mrs. Ingersoll's room, except those persons brought in by William, and whom Mrs. Ingersoll knew were associated with William in one way or another.

When Mrs. Ingersoll "transferred the Dexter Street property to William on April [6], 1999, in trust and all of her tangible personal property in trust on April 1, 1999," the court declared, it was done "so that the Dexter Street property and contents would be transferred to Barbara." Moreover, in a handwritten note dated November 10, 1999, and found by Barbara two months after her mother's death, "Mrs. Ingersoll[ ] reiterated or made clear what she understood had been accomplished in her Trust of April 1, 1999, or amended that Agreement to reflect her intent that William, Trustee, transfer the Dexter Street property and its contents to Barbara." [14]

Concerning the Foundation provided for in the 1996 and 1999 trust documents, the trial court stated, "there is absolutely no indication of any awareness by Mrs. Ingersoll of the Foundation provisions of her Trusts, and there is no documented history of Mrs. Ingersoll being interested in or disposed toward the creation of a Foundation...." Consequently, the court ruled:

It has been established by clear and convincing evidence that William abused and betrayed Mrs. Ingersoll's trust, confidence and reliance in and on him when without authorization from Mrs. Ingersoll, he instructed Mr. Nudelman to include in the First Amendment to the Amended and Restated Loraine Boley Ingersoll Revocable Trust Agreement of October 7, 1996 the William Brown Ingersoll and Loraine Boley Ingersoll Foundation and when he instructed Mr.

14. The first page of the November 10, 1999 note said:

Barbara gets my house on Dexter St, N.W. [], and all the contents[,] clothing, jewelry, furniture, televisions, glassware, & china & glassware. Piano, silverware, etc. as I want my house to be enjoyed by my grandchild, children, & Friends as it was left. It can be left for Barbara to decide what she wants and asks the Grandchild to come & get it for their Houses.

Barbara
She has taken care of me for 15 years, and half of the contents she has paid for with her own money.

John Hargett, an expert witness and forensic document examiner, testified that the November 10, 1999 note "is the normal and natural writing of [Mrs.] Ingersoll."

Vaughn to include in the Loraine Boley Ingersoll Trust dated April 1, 1999, the Ingersoll Family Foundation, in the latter of which he was given sole and complete power of disposition over 25% of Mrs. Ingersoll's gross estate.

To support these findings, the trial court reviewed William Brown and Loraine Boley Ingersoll's intent pertaining to charitable bequests, as manifested in their historic trust and will documents. The court ascertained that no charitable gifts were made in April 15, 1977 (Trust of William and Will of Loraine); November 17, 1989 (Will and Trust of Loraine); May 1993 (Trust of Loraine); July 12, 1993 (Will Codicil of Loraine), and October 7, 1996 (Will Codicil of Loraine). From this document review and the fact that William was the only Ingersoll sibling aware of the Ingersoll Family Foundation provision in the April 1, 1999 trust document, the trial court stated:

> The Court finds that it has been established by clear and convincing evidence that Mrs. Ingersoll was greatly influenced in her testamentary intent by her deceased husband's testamentary scheme, which was to give all of his assets to their children, equally. Mrs. Ingersoll followed his scheme, except she developed the independent intent to give and gave her Dexter Street home and its contents to Barbara Jane Ingersoll.

In its judgment dated February 25, 2005, the trial court, in part: (1) declared void and struck Article IX of the April 1, 1999, Trust, which related to the establishment of the Ingersoll Family Foundation; (2) declared void and struck provisions of the October 7, 1996, First Amendment to the Amended and Restated Loraine Boley Ingersoll Revocable Trust Agreement, pertaining to the William Brown Ingersoll and Loraine Boley Ingersoll Foundation; (3)

ordered William Ingersoll to restore to the 1999 Trust assets delivered to or paid out of the Ingersoll Family Foundation, including the $100,000 charitable gift to the Marriott Public Charter School; (4) ordered William to transfer title to the Dexter Street property to Barbara "in fee simple by trustee's deed or special warranty deed"; (5) ordered William to transfer to Barbara "all tangible personal property" located at the Dexter Street property on the date of Mrs. Ingersoll's death; (6) as an alternative, in the event this court reverses the orders concerning the Dexter Street real and personal property, ordered William to pay Barbara "Two Million Dollars ($2,000,000)"; (7) "reformed" the 1999 Trust "so that the transfers to [ ] Barbara [ ] [would be] made in addition to, and not as part of, [her] one-fourth interest in the [1999 Trust]"; (8) ordered William to dismiss with prejudice the Landlord and Tenant action against Barbara involving the Dexter Street property; (9) dismissed Barbara's claims to the Delaware property; (10) dismissed with prejudice Barbara's claims for removal of William as trustee of the Trust, with respect to "acts or omissions alleged in [her] Verified Second Amended and Supplemental Complaint"; (11) dismissed William's counterclaim as trustee with prejudice, "except with respect to (a) the 2counterclaim for conversion of the Putnam Mutual Fund and Nations Bank/Bank of America accounts," which was "dismissed, without prejudice, subject to adding William [ ][as] Personal Representative of the Estate of [Mrs.] Ingersoll, as a party ... and (b) his counterclaims against Barbara seeking expenses relating to [the Dexter Street property] since his mother's death (if Barbara "was the equitable owner [of the Dexter Street property] as of that date and has enjoyed sole use and possession since then), or to hold Barbara [ ] liable for the fair rental value" of the Dexter Street

property "during her occupancy (in the event [she] was not the equitable owner as of the date of [Mrs. Ingersoll's] death)."

On May 4, 2005, the trial court signed orders (which were mailed on July 8, 2005), denying William's motion to amend his counterclaim "to add his capacity as personal representative of the estate of Loraine Boley Ingersoll, as counterplaintiff," as well as William's motion for judgment on his counterclaim.

## ANALYSIS

### Undue Influence

Appellants challenge the trial court's findings and conclusions regarding undue influence. They contend that "the record was barren of—and [the trial judge] did not point to—any clear or convincing evidence of 'physical or moral coercion,' [ ] duress, . . ., 'improper means,' or the failure to meet 'commonly accepted standards.'" They maintain that the trial court's conclusion that they engaged in "a sinister scheme to deprive Barbara of interests that Mrs. Ingersoll desired her daughter to have" or "to interfere with Mrs. Ingersoll's testamentary intent toward Barbara is unsupported by the record." They claim that the trial court's finding of Mrs. Ingersoll's "isolation" from attorneys, including Attorney Recht, due to William's actions, is clearly erroneous. They take strong exception to the trial court's finding that "the conduct of William and [his associate], Mr. Zawatsky in sitting on Mrs. Ingersoll's hospital bed was 'inappropriate,' 'demeaning,' 'disrespectful' and 'intimidating.'"

Barbara Ingersoll contends that "the trial court properly found that William exploited his confidential relationship with his mother and substituted his wishes for hers, thereby unduly influencing her." She argues that the trial court "relied . . .

on the well-developed record that William seized control over and had virtually all of the communications with Mrs. Ingersoll's several estate planners (the only exceptions being a handful of communications that included Henry), with no credible evidence that William was carrying out Mrs. Ingersoll's wishes rather than his own."

The District maintains that the trial court "(1) mistakenly presum[ed] undue influence from Mrs. Ingersoll's failure to specify the objects and purposes of the foundation in 1996, (2) mistakenly treat[ed] William's power over the disposition of foundation assets as a special benefit not shared by his siblings, that supported an inference of undue influence, and (3) mistakenly fail[ed] to presume that Mrs. Ingersoll was aware of the contents of what she signed." "Correction of these legal errors," the District asserts, "would allow the trial court to give proper consideration to findings and evidence that tend to rebut an inference of undue influence, such as":

(1) the way the 1996 and 1999 trust documents divided assets equally among Mrs. Ingersoll's children; (2) the tax advantages of creating a charitable foundation; (3) Mrs. Ingersoll's July 1995 meeting with attorney Ronald Recht, and Mr. Recht's follow-up letter discussing the need for a charitable lead trust; (4) Mrs. Ingersoll's initials in the left margins of the 1999 amendment, including her initials next to the provision establishing the Foundation; and (5) Mrs. Ingersoll's extensive reliance "on William to advise her and carry out her intentions and instructions with respect to the disposition and distribution of her assets, both before and after her death."

Generally, "[w]hen the case was tried without a jury, the court may review both as to the facts and the law, but the judgment may not be set aside except for errors of law unless it appears that the

judgment is plainly wrong or without evidence to support it." D.C.Code § 17–305(a) (2001). Undue influence is a mixed question of fact and law, and our review of the legal issues is *de novo*. *See Perkins v. United States*, 936 A.2d 303, 305 (D.C. 2007). We have said previously, "[u]ndue influence is influence amounting to physical or moral coercion that forces the testator to exercise the judgment of another rather than [her] own." *Himmelfarb v. Greenspoon*, 411 A.2d 979, 984 (D.C.1980) (citations omitted). "[T]he pressure on the testator must destroy [her] agency and free will; in effect, the will of another must be substituted for [her] own." *Id.* (citing *Towson v. Moore*, 11 App. D.C. 377, 381 (1897), *aff'd*, 173 U.S. 17, 19 S.Ct. 332, 43 L.Ed. 597 (1899) (other citations omitted)). The will must be "the direct result of force or coercion, . . . ." *Estate of Broun v. Broun*, 413 A.2d 1310, 1313 (D.C.1980). Several factors have been advanced to determine whether a trust has been created as a result of undue influence, including "whether and to what extent a fiduciary or confidential relationship existed . . . ." [15]

■■■ "Confidential relations existing between the testator and beneficiary do not alone furnish any presumption of undue influence," *MacMillan v. Knost*, 75 U.S.App. D.C. 261, 262, 126 F.2d 235, 236 (1942); there must be proof of coercion, *Butler v. Harrison*, 578 A.2d 1098, 1102 (D.C.1990) (citations omitted). " '[P]ossi-

bility or suspicion of undue influence' is not enough." *MacMillan, supra*, 75 U.S.App. D.C. at 262, 126 F.2d at 236 (quoting *Beyer v. LeFevre*, 186 U.S. 114, 126, 22 S.Ct. 765, 46 L.Ed. 1080 (1902)); *see also Himmelfarb, supra*, 411 A.2d at 984 ("Mere suspicion is insufficient."). "[P]articularly in family relationships, such as parent-child and husband-wife, the existence of a confidential relationship is an issue of fact, and is not presumed as a matter of law." *Upman v. Clarke*, 359 Md. 32, 753 A.2d 4, 9 (2000) (citation omitted). Thus, "the mere existence of a familial relationship is not indicative of a confidential relationship." *Orwick v. Moldawer*, 150 Md.App. 528, 822 A.2d 506, 512 (2003) (citations omitted). Rather, "[t]he issue is whether a level of trust and confidence exists between two people to the point that the testator trusts another to conduct the testator's business and that trusted person abuses that trust in some way to gain a benefit in the testator's will." *Id.* And, undue influence may not be presumed solely because of the testator's illness or old age. *See Orwick, supra*, 822 A.2d at 513 n. 4 (citation omitted); *Henkel v. Alexander*, 198 Md. 311, 83 A.2d 866, 869 (1951) ("mere old age is not sufficient to invalidate a deed or will from a parent . . . to a child, although it is a fact to be considered in determining whether undue influence or persuasion was exercised") (other citations omitted).

15. Restatement of the Law (Third), Trusts ("Restatement Trusts"), § 12 cmt. (b) (2003). Comment (b) reads, in part:

On the question of whether a settlor has been induced to create a trust by undue influence, the following factors may be of importance: (1) whether and to what extent a fiduciary or confidential relationship existed between the person charged with undue influence and the settlor at the time the settlor was persuaded to create the trust; (2) whether it was the trustee, a beneficiary, or a third person who persuaded the settlor

to create the trust; (3) whether and to what extent it was improvident for the settlor to create the trust; (4) the settlor's age, health, intelligence, and business experience and whether the settlor had independent legal advice at the time of the decision to create the trust; and (5) whether the character and provisions of the trust are such that it would have been unnatural for a person in the settlor's position to create it. Most of these factors are also likely to be of importance in cases involving allegations of fraud.

Furthermore, "[u]ndue influence is influence gained by improper means." *In re Estate of Weir*, 154 U.S.App. D.C. 404, 408, 475 F.2d 988, 992 (1973). "Neither the fact that the natural objects of the testator's bounty were disproportionately awarded under the will nor the fact that the will may be unnatural or unjust is enough to constitute undue influence." *Himmelfarb, supra*, 411 A.2d at 984 (citation omitted). In short, " '[i]t is not influence, but undue influence that is ... necessary to overthrow a will.' " *Roberts–Douglas v. Meares*, 624 A.2d 405, 418 (D.C.1992) (quoting *Beyer, supra*, 186 U.S. at 124, 22 S.Ct. 765).

Where a plaintiff seeks to have the trial court reform a trust because of alleged undue influence, "the settlor's intent must be proven with clear and convincing evidence...." [16] *In re Estate of Tuthill*, 754 A.2d 272, 275 (D.C. 2000) (citations omitted). "Clear and convincing evidence is most easily defined as the evidentiary standard that lies somewhere between a preponderance of evidence and evidence probative beyond a reasonable doubt"; it "is such evidence as would produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *In re Estate of Walker*, 890 A.2d 216, 223 n. 6 (D.C.2006) (citations and internal quotation marks omitted).

In the instant case, the trial court was confronted with contentious parties, a plethora of exhibits, extensive testimony lasting in excess of one week, and limited case law in this jurisdiction relating to the issues presented. And the trial court obviously gave considerable time and attention to this lawsuit and the drafting of findings and conclusions. Yet, in light of applicable legal principles and our review of the extensive record in this case, we conclude that the trial court was mistaken in its analysis of the undue influence issue, undoubtedly in part, because of our jurisdiction's undeveloped case law. In addition, the trial court ignored, or at least did not take into account, virtually all of the testimony of William. The trial court's findings characterize William as a disobedient son who manipulated his mother's estate to his own advantage. Indeed, the court evidences disdain for the role of William. But, the court does not explicitly discredit William's testimony, much of which shows, or strongly suggests, that he was acting on instructions from his mother following her own consultation with knowledgeable personal friends.

The trial court concluded that the type of relationship William enjoyed with his mother, which the court described as "confidential," resulted in abuse of his mother, or undue influence, as manifested by (a) William's termination of his mother's contact with Mr. Recht, and his failure to "facilitate any contact between Mrs. Inger-

---

**16.** *See also Howard v. Nasser*, 364 S.C. 279, 613 S.E.2d 64, 67 (2005) ("the circumstances relied on to show [undue influence] must be such as taken together point unmistakenly and convincingly to the fact that the mind of the testator was subjected to that of some other person, so that the will is that of the latter and not of the former") (citations omitted); RESTATEMENT, TRUSTS, § 62, cmts. (b) and (c) ("The court may reform the terms of a trust, even if unambiguous, to conform the terms to the settlor's intention if it is proved

by clear and convincing evidence that both the settlor's intent and the terms of the trust were affected by a mistake of fact or law, whether in expression or inducement."); RESTATEMENT, TRUSTS, § 12, cmt. (b) (with respect to "fraud and undue influence ... the burden of proof is by clear and convincing evidence"); *Davis v. Altmann*, 492 A.2d 884, 885 (D.C.1985) ("Where the gift is first asserted after the death of the donor, the rule requires it to be established by clear and convincing evidence.").

soll and any attorney, except himself and his associate, Mr. Zawatsky," (b) William's instructions to Mr. Nudelman and Mr. Vaughn to include a provision for a charitable foundation in the amended trust document, ultimately providing for William's sole control and power over 25% of his mother's estate, and (c) Mrs. Ingersoll's April 1, 1999, signing of legal documents "in her hospital bed when she was weakened [ ] physically and mentally," during which first Mr. Zawatsky, and then William, sat on the edge of her hospital bed, and her "room [was] full of William's associates," and "Barbara was out with William's wife."

We first examine the nature of William's role with respect to his mother's estate, and second, whether William abused his relationship with or his duty to his mother to such an extent that he exerted undue influence on her to sign testamentary documents in October 1996, and April 1999. We are mindful that "the existence of a confidential relationship is an issue of fact, and is not presumed as a matter of law," *Upman, supra,* 753 A.2d at 9, and that "[c]onfidential relations existing between the testator and beneficiary do not alone furnish any presumption of undue influence." *MacMillan,* 75 U.S.App. D.C. at 262, 126 F.2d at 236. Thus, the issue on which we focus "is whether a level of trust and confidence exist[ed] between [Mrs. Ingersoll and William] to the point that [Mrs. Ingersoll] trust[ed] [William] to conduct [her] business and that trusted person [William] abuse[d] that trust in some way to gain a benefit in the testator's will." *Orwick, supra,* 822 A.2d at 512.

The trial court found that "William has been an attorney for many years and Mrs. Ingersoll depended on him for legal advice for many years...." The record does not support a finding that Mrs. Ingersoll depended on William for legal advice about her estate. In fact, the testimony of attorneys who drafted documents for Mrs. Ingersoll (Mr. Recht, Mr. Nudelman, Mr. Vaughn) and William's testimony, demonstrate that William did not act in the capacity of an estate attorney for his mother. It is true, as the trial court found, that William is an attorney, but his legal specialty is resort development law, and he rendered zoning advice in the past, and there is no indication that William is an estates attorney. Rather than render direct legal advice to his parents about their estate, William responded to their requests that he find lawyers to advise them. Prior to his death in 1977, William's father, William Brown Ingersoll, asked William, his oldest son, to obtain an attorney to draft testamentary and trust documents for him and Mrs. Ingersoll. Similarly, some time in 1988, Mrs. Ingersoll expressed to William her desire to meet with an estate attorney for the purpose of updating her testamentary documents; she did not request legal advice from William. William sought the services of Mr. Recht for his mother. In drawing the conclusion that William provided legal advice to his mother, the trial court neither discredits nor mentions William's testimony concerning his mother's September 1996 consultation about her estate with Mr. Horne, her deceased husband's "lifetime business partner," and in 1998, with Mr. Merrell, a long time personal friend and lawyer; both consultations led to the engagement of two estate attorneys, Mr. Nudelman and Mr. Vaughn, to prepare testamentary documents for Mrs. Ingersoll. Nor does the record establish that William conducted his mother's day-to-day business concerning her estate. That task appeared to have been left primarily to the family's accounting firm and his mother's broker.

Although the record does not support a finding that William gave legal advice to his mother, that is, that he had an attor-

ney-client confidential relationship with his mother, or that he conducted the day-to-day business relating to her estate, the record does show that William played a role in the marital and testamentary trusts. After their father's death in June 1977, William, and Henry, the next oldest brother, became co-trustees of the marital trust, as well as the testamentary trust. They managed the assets, which included real property in several jurisdictions, but they removed and separately managed assets of the children's trust.[17] Until he left the area in 1986, Henry had responsibility for paying, from his mother's accounts, bills pertaining to the Dexter Street and Delaware properties, which remained in the trust. After Henry moved away from the area, Joseph assumed responsibility for the administration of these properties, including the payment of bills for Barbara's house in Maryland. We have not found anything in the record which shows that William handled his mother's "day-to-day financial decisions," or controlled her assets during her lifetime, see *Orwick*, 822 A.2d at 512–13. Rather, based on our reading of the record, William was "entitled to exercise trust powers ..., [but he was] limited, in [his] immediate control over the [trust] property, to [his] authority as trustee[ ]." *Upman, supra*, 753 A.2d at 11. Nevertheless, due to his status as trustee-beneficiary, the trial court could presume a fiduciary relationship between William and his mother as to her marital and testamentary trusts, *id.* at 9, but that relationship by itself does not establish undue influence. *MacMillan, supra; see also* 1 SCOTT AND ASCHER ON TRUSTS, § 4.6.2 (5th ed. 2006) ("The mere fact that there was a confidential or fiduciary relationship between the settlor and the trustee or one or more of the beneficiaries is, [ ] by itself, insufficient" to prove undue influence).

Hence, we now turn to the trial court's conclusion that William abused his "confidential" relationship with his mother to such an extent that he exerted undue influence on her to sign testamentary documents in October 1996 and April 1999. The trial court focused on William's alleged actions regarding the various attorneys who prepared testamentary documents for Mrs. Ingersoll. First, the court declared, "[i]n July 1995, William cut off and prevented any further contact between Mrs. Ingersoll and her attorney, Mr. Recht." The trial court's written findings are silent as to why it rejected William's explanation concerning the reason why Mr. Recht ceased being Mrs. Ingersoll's estate attorney. According to William, after reading Mr. Recht's letter of July 21, 1995, Mrs. Ingersoll deemed Mr. Recht's approach "too complicated," and thought that it did not reflect her desire to maintain control of her estate assets until her death.

Second, the trial court apparently found abuse in William's failure "to facilitate any contact between Mrs. Ingersoll and any attorney, except himself and his associate." William testified that after she had her discussion with his father's long-time business partner, his mother, who by then was around 87 years of age, instructed William "to get it done," meaning to see that documents were drafted along the lines described by Mr. Horne. William approached Mr. Deane at the family's accounting firm who called in Mr. Gaffey, who suggested Mr. Nudelman as a competent estates attorney. William did not

---

**17.** William and Henry bought properties out of the children's trust [for William, Barbara, Henry and Joseph] and placed them into a general partnership for the children, Greenwood Associates, a Virginia general partnership. William and Henry developed the properties, turning apartments into condominiums. Henry did the construction and architectural work, and William the financing and legal work.

know Mr. Nudelman, and based on Mr. Nudelman's testimony, the trial court correctly concluded that Mrs. Ingersoll never met with Mr. Nudelman. However, William stated that he met with his mother to determine her wishes with respect to how the estate's assets would be handled, and after the documents were drafted, he met with his mother and reviewed the documents.

Mr. Vaughn, another trust estates attorney, whom William did not know, but who was engaged after Mrs. Ingersoll voiced a desire to make sure all of her estate documents were in order, reviewed Mrs. Ingersoll's 1989, 1993 and 1996 testamentary documents. There is a conflict in the testimony as to whether Mr. Vaughn met directly with Mrs. Ingersoll. He recalled that he did not meet with her, but William remembered a meeting with his mother, Mr. Vaughn and himself on November 17, 1998. At any rate, on December 30, 1998, Mr. Vaughn sent William drafts of the testamentary documents he prepared, and William met with his mother a few days later, "probably more than an hour," to review and explain them to his mother. Mrs. Ingersoll's attention apparently centered on the allocation of assets. Mrs. Ingersoll took copies of the documents to review them further. Three weeks later Mrs. Ingersoll again met with her son and raised questions about the grandchildren's trust. Still later, at the end of February 1999, Mrs. Ingersoll telephoned William and said she was ready to sign the documents. While Mrs. Ingersoll did not have any direct contact with Mr. Nudelman and may not have had any with Mr. Vaughn, the central issue is whether the documents she signed reflected her intent.

In that regard, the trial court wrote "that it has been established by clear and convincing evidence that Mrs. Ingersoll gave William no instruction to create the Ingersoll Family Foundation, because she would never have preferred one child above all of her other children, so as to give to one the sole power of disposition over 25% of her estate," because she wanted her estate to be divided equally among her four children. Similarly, the court ruled, "[i]t has been established by clear and convincing evidence that William abused and betrayed Mrs. Ingersoll's trust, confidence and reliance in and on him when without authorization from Mrs. Ingersoll, he instructed Mr. Nudelman to include in the [October 1996 trust amendment] the William Brown Ingersoll and Loraine Boley Ingersoll Foundation...." The court attributed the creation of the Foundation to undue influence exerted by William on his mother.

Our reading of the record does not support the conclusion that Mrs. Ingersoll did not authorize the Foundation. First, the trial court presumes, or infers, that Mrs. Ingersoll did not authorize the Foundation, and would not have given sole power over 25% of her estate to William. But this presumption or inference does not rise to clear and convincing evidence, and significantly, conflicts with record evidence. Mr. Recht met with Mrs. Ingersoll when he served as her estate attorney, and he testified that Mrs. Ingersoll "wanted to make what we would consider substantial charitable gifts"; he acknowledged that a charitable gift in excess of one million dollars "comes to mind." William testified that when his mother met with Mr. Horne on September 8, 1996, she discussed charitable contributions with him, and he raised the idea of a charitable foundation because he had had experience establishing one. And, it was Mr. Vaughn who "recommended that the provisions for the foundation be expressed as a percentage and as a specific bequest." Moreover, when Mrs. Ingersoll signed the documents in 1996, and 1999, which contained the Foundation

provisions, a strong presumption arose that she knew the contents of the documents.[18]

Finally, the trial court supported its conclusion that William abused his fiduciary relationship to his mother and exerted undue influence on her by "the circumstances of presenting [testamentary] documents to Mrs. Ingersoll in her hospital bed when she was weakened [ ] physically and mentally, in a room full of William's associates, one of whom sat on her bed and when Barbara was out with William's wife." Our review of the record does not support the trial court's pronouncements, and further, does not depict moral or physical coercion exerted by William on his mother. Notably, these circumstances do not relate to Mrs. Ingersoll's execution of the October 1996 testamentary documents. Furthermore, although Mrs. Ingersoll had had bypass heart surgery on March 23, 1999, and had been diagnosed with pancreatic cancer around March 14, 1999, hospital records for early afternoon revealed that she had normal skin color, a regular heart beat, clear lungs, stable vital signs and was "[a]lert and oriented X 3." Her speech was "broken at times," but she was "able to communicate needs to staff." After his mother informed William on March 31, 1999, that she wished to sign the documents drafted by Mr. Vaughn, William relayed his mother's desire to the head nurse and inquired whether there would be any problem with his mother signing the documents. The nurse raised no objection. Mr. Zawatsky, one of the witnesses, exchanged greetings with Mrs.

Ingersoll, and she knew who he was, recalling that he was "that nice man Jay Zawatsky who helped [her] with [her] gift deed." Mr. Pugh, another witness, described Mrs. Ingersoll as "very alert, cognizant of ... what we were doing and what she was doing." The notary, Ms. Size, stated that Mrs. Ingersoll "seemed very alert and she was talking."

Hence, the record does not show that Mrs. Ingersoll was so physically weak and mentally impaired that she could not have known what she was signing. Moreover, even if we agreed with the trial court that Mr. Zawatsky's conduct in sitting on Mrs. Ingersoll's bed constituted "inappropriate, demeaning ..." behavior, and further, that William's conduct in sitting on his mother's bed was "disrespectful, [and] demeaning ..." (especially, as the trial court put it, since only William and individuals associated with him were in the hospital room), that conduct does not rise to the level of intimidation sufficient to support a finding of undue influence. Even though the trial court may have been suspicious of coercion due to the presence of William's associates, or the illness and age of Mrs. Ingersoll, neither suspicion of undue influence, nor illness and old age alone would be enough to constitute clear and convincing evidence of undue influence. *See Himmelfarb, supra,* 411 A.2d at 984; *Orwick, supra,* 822 A.2d at 513 n. 4.

As we emphasized in *Meares, supra,* "undue influence consists of 'physical or moral coercion that forces the testator to exercise the judgment of another rather than [her] own,'" 624 A.2d at 418.

---

**18.** *See In re Estate of Herbert,* 90 Hawai'i 443, 979 P.2d 39, 51–52 (1999) (citing 1 PAGE ON THE LAW OF WILLS, § 13.4, at 666) (other citations omitted) ("there is a strong presumption that an ablebodied testator ... knew the contents of his or her will...."). Furthermore, as amicus curiae reminds us, we have said that "[c]ourts generally hold that '[a] will purporting to establish a charitable trust is to be given liberal construction and legacies for the use of charity will not be declared void if they can, by any possibility, consistent with law, be held valid.'" *Washington Hosp. Ctr. Health Sys. v. Riggs Nat'l Bank of Washington, D.C.,* 575 A.2d 719, 722–23 (D.C.1990) (citations omitted).

The mere act of influencing a person is insufficient to establish undue influence. *Id.* Equally insufficient is "influence gained by years of mutual affection" between a mother and her son. *See In re Estate of Weir,* 154 U.S.App. D.C. 404, 408, 475 F.2d 988, 992 (1973). While direct proof of undue influence is not required, there must be more than conclusory allegations and speculation; "affirmative evidence of facts and circumstances from which the exercise of such undue influence can fairly and necessarily be inferred," must be present in the record. *See In re Estate of Greenwald,* 47 A.D.3d 1036, 849 N.Y.S.2d 346 (2008). The type of affirmative evidence which can demonstrate physical or moral coercion includes threats, force, restricted visitation, psychological domination, and an unnatural disposition (that is, for example, to one who is not related by blood or marriage).[19] In *Knowles v. Binford,* 268 Md. 2, 298 A.2d 862 (1973), the court found undue influence where the testimony showed certain acts by the testator's friend and the friend's nephew, including physical restraint of the testator, interception and destruction of letters from the testator's niece, refusal to allow the testator to accept calls from her nieces, control of the testator's finances, preventing the testator from meeting alone with her relatives, obtaining a new lawyer to draft an amendment to the testator's deed of trust, and withholding from the testator letters addressed to her by the trustee of her trust estate and her new attorney. *Id.* at 864–65. That type of affirmative evidence demonstrating physical or moral coercion exerted by William on his mother does not appear in the record before us.

In sum, the trial court's findings and conclusion of undue influence are based on a misconception of the law of undue influ-ence, and hence, the trial court's erroneous findings are clearly erroneous. *See Butler, supra,* 578 A.2d at 1102. And, even if we accepted those findings, they do not support the legal conclusion that William exercised undue influence over his mother. *See Himmelfarb,* 411 A.2d at 984. Consequently, we are constrained to vacate the trial court's findings and conclusions, and to reverse its judgment with respect to Barbara's claims of undue influence.

### The Dexter Street Property and Tortious Interference With Inheritance

The trial court determined that William intentionally interfered with Barbara's inheritance of the Dexter Street property and its contents, as well as one-fourth of the remaining assets of Mrs. Ingersoll's April 1, 1999 trust corpus and income. The trial court based its determination on (1) "Mrs. Ingersoll's formulation for equal treatment of all her children," and (2) her November 10, 1999 handwritten document which the court interpreted as an amendment to her April 1, 1999 trust document. The court stated: "It has been established by clear and convincing evidence that Mrs. Ingersoll transferred the Dexter Street property to William on April 6, 1999, in trust and all of her tangible personal property in trust on April 1, 1999, so that the Dexter Street property and contents would be transferred to Barbara," but William "deliberately, knowingly and intentionally abused and betrayed his fiduciary and confidential relationship that he had with Mrs. Ingersoll as her sole and only legal and financial adviser, by failing to incorporate in Mrs. Ingersoll's Trust Agreement gifts to Barbara" of the Dexter Street property and its contents.

In the alternative, and in the event that the note of November 10 did not amend

---

**19.** *See* Ray D. Madoff, *Unmasking Undue Influence,* 81 MINN. L.REV. 571 (1997); Mark R. Siegel, *Unduly Influenced Trust Revocations,* 40 DUQ. L.REV. 241 (2002).

Mrs. Ingersoll's April 1, 1999 testamentary trust, the trial court declared that "William tortiously interfered with and prevented [Barbara] from inheriting ... title to and enjoyment of [the Dexter Street property] and its contents, over and above one-fourth of the remainder of the assets of the April 1, 1999 Trust." Under this alternative, Barbara "would be entitled to restitution ... of the [Dexter Street property] or money damages in the amount of $2,000,000 from [ ] William."

Appellants argue that the District "has not recognized claims based on tortious interference with expectation of inheritance," and has not "extended its common law application of claims sounding in intentional interference with contractual relations, or with business expectancies, to testamentary claims or expectations." They also maintain that the court "erred as a matter of fact and law" in concluding that Mrs. Ingersoll's handwritten note of November 10, 1999, showed Mrs. Ingersoll's intent to leave the Dexter Street property to Barbara, in addition to one-fourth of the remainder of her estate, and was the final step in realizing her intent that the Trustee transfer the property to Barbara after her death. They argue that as used in the note of November 10, 1999, the word "gets" translates into an opportunity to purchase, and they further assert that the incomplete and unsigned note is unenforceable.

Appellee acknowledges that this court has not recognized "liability for tortious interference with an expectancy," but nevertheless argues that this court and "the D.C. federal courts (applying local law) have consistently recognized the availability of damages for tortious breach of a fiduciary or confidential relationship." She contends that even if her mother intended for her to purchase the Dexter Street property, William "kept that a secret from [Mr.] Nudelman and [Mr.] Vaughn," thereby ensuring that [she] "had no legally enforceable right to Dexter Street and its contents." Moreover, she claims, William "was able to engage in the charade of offering Dexter Street to [her] at fair market value while refusing to provide her with the property appraisal and then manufacturing a reason to withdraw his erstwhile offer." She contends that "William's abuse of Mrs. Ingersoll's trust and confidence" constituted tortious interference with her expected inheritance of the Dexter Street property. Furthermore, appellee insists that the trial court correctly construed Mrs. Ingersoll's intent as reflected in her November 10, 1999, handwritten note, and that that note properly amended the April 1, 1999 trust document.

Even assuming, without deciding, that this jurisdiction recognizes the tort of intentional interference with an expected inheritance,[20] we cannot say on this record that appellee satisfied her burden as to all

---

**20.** As of the decade of the 1990s, Maryland had not decided whether to recognize the tort of interference with expected inheritance. *See Anderson v. Meadowcroft*, 339 Md. 218, 661 A.2d 726 (1995). There, the court decided it was unnecessary to resolve the recognition issue because the complaint in that case did not "adequately allege undue influence," one of the prerequisites for the tort, *id.* at 730; *see also Geduldig v. Posner*, 129 Md. App. 490, 743 A.2d 247, 255 (1999). Virginia does not recognize the tort. *See Economo-*

*poulos v. Kolaitis*, 259 Va. 806, 528 S.E.2d 714, 720 (2000) ("[A] cause of action for 'tortious interference with inheritance' is not recognized in Virginia' "). For a discussion and identification of states that have and have not recognized the tort, *see* Diane J. Klein, *The Disappointed Heir's Revenge, Southern Style: Tortious Interference With Expectation of Inheritance–A Survey With Analysis of State Approaches in the Fifth and Eleventh Circuits,* 55 BAYLOR L.REV. 79, 85 n. 15, 97–132 (2003).

of the elements of that tort. The elements of the tort are:

(1) the existence of an expectancy; (2) a reasonable certainty that the expectancy would have been realized, but for the interference; (3) intentional interference with that expectancy; (4) tortious conduct involved with interference, such as fraud, duress, or undue influence; and (5) damages.

*Geduldig,* 743 A.2d at 256 (citing *Doughty v. Morris,* 117 N.M. 284, 871 P.2d 380 (Ct.App.1994)).[21]

We first examine the record evidence relating to Barbara's expectation that she would inherit the Dexter Street property, and Mrs. Ingersoll's intent regarding that property. Mrs. Ingersoll's handwritten note, dated July 15, 1989, expressed her desire to leave her estate to her four children "equally." She also wanted "one of [her] children [to] buy out [the Dexter Street property] so that it would stay in the family," and she stated, "Barbara will take what she needs to furnish an apartment in Washington, and a house in Delaware...." Mrs. Ingersoll's November 6, 1992 handwritten note to Mr. Recht specified that Barbara was to have "the first right of purchase of the two homes in Washington, D.C. and Delaware." In addition, Mrs. Ingersoll stated that the contents of the beach home and the Dexter Street property would go to Barbara, and that "[i]n lieu of the above gift to" Barbara, each of her sons would receive "$20,000 in cash."

The February 20, 1995 five-page note, handwritten by Mrs. Ingersoll, notarized, and sent to Mr. Recht is slightly different in its terms. Barbara would receive the contents of the three homes (Dexter Street, beach home in Delaware, and apartment in Florida), but the Dexter Street and Delaware homes would go to Barbara and Joseph, and William would have the right to purchase Mrs. Ingersoll's half interest in the Florida property. Mrs. Ingersoll added a post script: "All the division of all other properties and holdings, outside the[ ] three houses, are to be equally divided between my four children-as stands in previous stated will." Mr. Recht met with Mrs. Ingersoll, Barbara and William some time after receiving the February 20, 1995 letter, and his letter of July 21, 1995 to William summarizes the conclusions reached, including that pertaining to the Dexter Street and Delaware homes. Barbara would have "the right to purchase" the Dexter Street and Delaware homes and their contents. Mr. Recht's letter indicates that the properties would be sold "at a price equal to their values as finally determined for federal estate tax purposes."

In contrast to Mrs. Ingersoll's February 20, 1995 letter to Mr. Recht, her November 10, 1999 handwritten note is neither signed nor notarized. Barbara found the note two months after her mother's death. It consists of two pages, and most of the second page contains notes and figures which are not self-explanatory. The first sentence of the note states that "Barbara gets my house on Dexter Street [ ], and all the contents ....," but the note does not mention whether Barbara would receive the property outright or would have the right to purchase it.

---

**21.** *See also* Mark R. Siegel, *Unduly Influenced Trust Revocations,* 40 Duq. L.Rev. 241, 253–58 (2002). The Restatement (Second) of Torts, § 774B (1979) provides:

One who by fraud, duress or other tortious means intentionally prevents another from receiving from a third person an inheritance or gift that he would otherwise have received is subject to liability to the other for loss of the inheritance or gift.

Barbara's and William's testimony differed on the December 1999 meeting held in Dr. Kaplan's office. Barbara insisted that her mother had said she, Barbara, "was to get that house on Dexter Street, free and clear." Barbara's testimony does not elucidate what Mrs. Ingersoll meant by "free and clear." Did it mean "tax free," as Mr. Kane (the gentleman who had homes in the same areas in the District and Delaware as the Ingersolls) testified, or did it signify that Barbara would not have to purchase the property? William asserted that his understanding was that Barbara "would be given the first right to purchase [the Dexter Street property] at the fair market value minus" the brokerage fee, if no broker was involved in the sale, and that Henry and Joseph "would have to approve the sale."

▇ Our review of the record shows that Barbara would satisfy the element of an expectancy. Through Mrs. Ingersoll's handwritten notes, and the testimony both of Barbara and William, it is clear that Mrs. Ingersoll intended for Barbara to have the Dexter Street property and its contents. What is not clear from the record is whether Mrs. Ingersoll's intent was that Barbara should purchase Dexter Street, and if so, based on what formula (assessed value, market value, estate tax valuation value, or some other value); or whether Mrs. Ingersoll wanted Barbara to have the Dexter Street property without paying for it, and if so, how that would impact her share of the remaining estate. Parenthetically, we cannot agree with the trial court, or Barbara, that Mrs. Ingersoll's handwritten note of November 10, 1999 constituted a valid and enforceable amendment of her April 1, 1999 trust document; the note is unsigned, is incomplete, ambiguous, contains notations on the second page which, standing alone, convey no meaning, shows no witnesses, and neither

the note nor the deed was delivered to Barbara. Under these circumstances, the note does not meet the requirements of D.C.Code §§ 18–103, 18–109, 28–3–115, 28.3–401, and 42–141, and hence, is unenforceable as an amendment to Mrs. Ingersoll's April 1, 1999 trust document.

Although Barbara would satisfy the first element of tortious interference with inheritance claim, that is, the existence of some sort of an expectancy, we are persuaded that she would not meet her burden to demonstrate intentional interference with that expectancy. She would be required to present clear and convincing evidence of such conduct as fraud, duress or undue influence. *Geduldig, supra,* 743 A.2d at 256. She claims that William "kept a secret from [Mr.] Nudelman and [Mr.] Vaughn, that is, that her mother intended for her to have the Dexter Street property, even assuming she had to purchase it, and that William engaged in a "charade" with respect to her purchase of the property—offering to sell it at fair market value but "refusing to provide her with the property appraisal and then manufacturing a reason to withdraw his erstwhile offer." Barbara appears to argue that William intentionally used deception to frustrate her mother's intent that she obtain possession of the Dexter Street property.

In an estate context, we have said that "fraud ... is characterized by false representations, concealment, or deception," and that "[u]nlike fraud, undue influence need not be attended at all with deception or circumvention." *Meares, supra,* 624 A.2d at 420 (internal quotation marks omitted). Other jurisdictions have defined undue influence in terms of both deception or fraud, and force or coercion. *See Pope v. McWilliams,* 280 Ga. 741, 632 S.E.2d 640, 644 (2006) ("Undue influence which operates to invalidate a will is such influence as

amounts either to deception or to force and coercion, destroying free agency.") (internal quotation marks omitted); *Curry v. Sutherland,* 279 Ga. 489, 614 S.E.2d 756, 757 (2005) ("Undue influence sufficient to invalidate a will amounts to deception or force and coercion operating on the testator at the time of execution such that the testator is deprived of free agency and the will of another is substituted for [hers].") (citations and internal quotation marks omitted). We have already concluded that Barbara has not presented evidence of physical force or moral coercion in her effort to prove undue influence by William. Nor has she "establish[ed] a claim for fraud based on undue influence," since she has not proved statements or acts showing that William "overcame the will of [Mrs. Ingersoll]." *See Tetrault v. Mahoney, Hawkes & Goldings,* 425 Mass. 456, 681 N.E.2d 1189, 1195 (1997) (citations omitted). Even if William had "kept a secret from [Mr.] Nudelman and [Mr.] Vaughn," that is Mrs. Ingersoll's intent to leave the Dexter Street property to her daughter, as Barbara alleges, that would not show that William overcame the will of his mother, as expressed in the documents she signed.

At most, Barbara has demonstrated that William had an opportunity to exert undue influence on his mother. But, "[e]vidence showing only an opportunity to influence," even when coupled with proof of "a substantial benefit under the will does not show the exercise of undue influence." *Curry, supra,* 614 S.E.2d at 757. And, the record reveals no substantial benefit to William; while there was a tax benefit from the transfer of 25% of Mrs. Ingersoll's estate to the Foundation, all of Mrs. Ingersoll's children benefitted from that transfer; and William received no compensation for his role in the Foundation. Furthermore, absent from the record is any credible evidence manifesting William's intentional scheme to defraud his sister of

her asserted expectancy—ownership of the Dexter Street property. William offered the property to Barbara at fair market value. As we noted earlier, the document most favorable to Barbara's claim (the 1999 handwritten note), when viewed in the context of previous expressions of Mrs. Ingersoll's wishes with respect to the house on Dexter Street, is unclear as to whether Barbara was to inherit the property as an additional bequest, or as part of an otherwise equal distribution among the siblings, or whether she was to acquire it by right of purchase. In short, even assuming that this jurisdiction would recognize tortious interference with an expected inheritance as a cause of action, Barbara would not satisfy a necessary element of the tort. Consequently, we vacate the trial court's findings and conclusions, and reverse its judgment relating to the November 10, 1999 note, and Barbara's tort claim.

In sum, we reverse the trial court's judgment concerning the undue influence and intentional interference counts of Barbara's complaint (Counts I and III), and remand this matter to the trial court with instructions to enter judgment in favor of appellants on those counts.

### William Ingersoll's Counterclaim

As trustee of the Trust, William filed a counterclaim against Barbara, alleging loss of fair rental value for the Dexter Street property, as well as her share of taxes on the property (Count I); common law waste, that is, Barbara's failure to properly maintain the Dexter Street property (Count II); tortious interference with prospective business advantage, that is the opportunity to sell the Dexter Street property (Count III); and conversion of mutual funds and bank accounts, specifically the Putnam mutual funds account and the Nations Bank/Bank of America account

(Count IV). In its order of February 25, 2005, the trial court dismissed the counter-claim with prejudice, except for the conversion count which was "dismissed, without prejudice, subject to adding [William in his capacity as] Personal Representative" of Mrs. Ingersoll's estate, within a specified time.[22] Later, on May 4, 2005, the trial court denied William's motion to amend the counterclaim to add his capacity as Personal Representative of Mrs. Ingersoll's estate, and further, the court denied William's motion for judgment on his counterclaim.

 Contrary to Barbara's argument, and the trial court's apparent ruling, William clearly had standing as trustee to claim the bank account since it was listed in the October 1996 Trust amendment.[23] If the Putnam account was not included in the Trust, the trial court abused its discretion by not granting William's motion to amend his counterclaim to add his capacity as Personal Representative of his mother's estate.[24]

The trial court did not have the opportunity to address the retroactive impact on William's conversion claim of the Uniform Nonprobate Transfers on Death Act, which became effective on April 27, 2001, *see* D.C.Code §§ 19–601,01, *et seq.; In re*

*Estate of Walker, supra,* 890 A.2d at, 221 n. 5 (remanding to the trial court to determine the retroactive impact, if any, of the Uniform Nonprobate Transfers on Death Act, including § 19–602.12(a), in litigation involving a joint bank account held by decedent and surviving account holder, when trial court considered only whether decedent had made an *inter vivos* gift but did not consider whether account balances transferred upon death in jointly-held account); *In re Estate of Blake,* 856 A.2d 1151, 1156–57 (D.C.2004) (remanding to the trial court to consider the Uniform Nonprobate Transfers on Death Act, including the application of § 19–602.12(a), which includes the presumption of a right of survivorship in a multiple-party account after one party dies, because the Act went into effect *three days before* trial court rendered its decision and neither party nor the trial court were apprised of the Act's existence). Therefore, we reverse the trial court's apparent ruling that William had no standing to bring the conversion count of the counterclaim (Count IV), but remand this case to the trial court for resolution of the conversion issue in the first instance.

We see no need to disturb the trial court's alternative conclusions concerning

---

22. The trial court concluded that the count for expenses relating to the Dexter Street property could be maintained in the event Barbara "was the equitable owner" of the property at the time of her mother's death or, in the alternative, if Barbara was not the equitable owner, she would be "liable for the fair rental value" of the Dexter Street property during her occupancy following her mother's death.

23. *See* RESTATEMENT (SECOND) OF TRUSTS, § 280, cmt. (a) ("If a third person commits a tort with respect to the trust property, [here conversion,] the trustee can maintain such actions at law as he could maintain by reason of his ownership of the property if he held it free of trust.").

24. William could have moved to reopen Mrs. Ingersoll's estate for the purpose of resolving the Putnam mutual funds account. *See* D.C.Code § 20–1301(d) (2001):

> (d) Neither the closing of the estate nor the termination of the personal representative's appointment shall prohibit the personal representative from thereafter performing whatever final administrative actions may be necessary to complete the affairs of the estate.

*See also Bowles v. Reade,* 198 F.3d 752, 757 (9th Cir.1999) (leave to amend is to be granted freely where justice so requires) (referencing Fed. Civ. R. 15(a)).

William's claim for the fair rental value of the Dexter Street property or for Barbara's share of the taxes on the Dexter Street property (Count I).[25] Consequently we sustain its judgment relating to Count I of the counterclaim.

Accordingly, for the foregoing reasons, we vacate the trial court's findings and conclusions pertaining to the undue influence and intentional interference counts of Barbara's complaint (Counts I and III), reverse its judgment regarding Counts I and III, and remand this case to the trial court with instructions to enter judgment for appellants on Counts I and III of Barbara's complaint. We also reverse the trial court's apparent ruling that William had no standing to bring Count IV of his counterclaim (conversion), but we remand this case to the trial court to determine the retroactive impact, if any, of the Uniform Nonprobate Transfers on Death Act on Count IV of William B. Ingersoll's counterclaim (conversion). However, we sustain the trial court's judgment concerning Count I of William's counterclaim.

*So ordered.*

---

**25.** Counts II and III of William's counterclaim no longer appear to be at issue.